713 A.2d 472

IN THE MATTER OF CITY OF JERSEY CITY, RESPONDENT–APPELLANT, v. JERSEY CITY POLICE OFFICERS BENEVOLENT ASSOCIATION, CHARGING PARTY–RESPONDENT, AND JERSEY CITY POLICE SUPERIOR OFFICERS ASSOCIATION, CHARGING PARTY.

Argued April 27, 1998—Decided July 9, 1998.

*Martin R. Pachman,* argued the cause for appellant (*Mr. Pachman,* attorney; *Robin T. McMahon,* on the briefs).

*Bruce D. Leder,* argued the cause for respondent Jersey City Police Officers Benevolent Association (*Schneider, Goldberger,*

*Cohen, Finn, Solomon, Leder & Montalbano;* attorneys; *Jacqueline Jassner Poquette,* former counsel, on the brief).

*Robert E. Anderson,* General Counsel, argued the cause for respondent Public Employment Relations Commission.

*Robert P. Curley* submitted a brief on behalf of *amicus curiae* New Jersey State Lodge Fraternal Order of Police (*Markowitz & Richman,* attorneys).

*Joseph Licata,* submitted a brief on behalf of *amicus curiae* New Jersey State AFL–CIO (*Loccke & Correia,* attorneys; *Richard D. Loccke,* of counsel).

*Paul L. Kleinbaum* and *Edward H. O'Hare,* submitted a brief on behalf of *amicus curiae* New Jersey State Policemen's Benevolent Association (*Zazzali, Zazzali, Fagella & Nowak,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal requires us to determine whether a city must negotiate with police unions before implementing a plan to transfer police officers from administrative and non-police positions to operational positions and to fill the administrative and non-police positions with civilian personnel. As part of a claimed reorganization of its police force, the City of Jersey City (City) sought to transfer officers formerly discharging non-police functions such as radio repair, supervision of school crossing guards, and maintenance of police property rooms, to operational or field positions such as patrol duty and community-based policing. The vacant positions were to be filled by civilians. The City did not engage in negotiations with the police unions concerning the plan. The police unions filed unfair practice charges with the Public Employee Relations Commission (PERC), alleging that the City engaged in unfair practices within the meaning of the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29, by unilaterally transferring work from police personnel to civilian employees not included in the police officers' bargaining units.

PERC determined that the "unit work rule" required the City to negotiate with the unions before transferring to civilians work that had been performed exclusively by police officers, and concluded that of the ten functions that the City had transferred from police officers to civilians, five had been performed exclusively by police officers and five had not. PERC thereafter issued an order directing the City to reassign to police officers those duties that had been performed exclusively by police officers and ordered the City to negotiate the transfer of such "police unit work" with union representatives.

The City appealed the order. The Appellate Division affirmed, substantially for the reasons set forth in PERC's decision and order. We granted the City's petition for certification. 152 *N.J.* 8, 702 *A.*2d 347 (1997).

I

In 1988, Murray and Mayo Associates, a management consulting agency, conducted a study of the Jersey City Police Department (Department). The study revealed that the Department could be run more efficiently if uniformed personnel in administrative positions were moved into field positions and if civilians assumed the uniformed personnel's former administrative duties. In that same year, the Police Director of Jersey City reached the same conclusion and proposed a departmental reorganization. In September 1992, the Police Chief of Jersey City identified sixty-four clerical, technical, and other non-police positions held by police officers that were to be filled by civilians. The police officers were to be deployed into field positions.

Generally following the Police Chief's recommendations, the City began reorganizing the Department in July 1993. Civilians displaced police officers in the following areas: (1) intra- and inter-departmental mail delivery, (2) the Bureau of Criminal Identification, (3) clerical duties performed by the station lieutenant's desk assistant, (4) the property room, (5) crossing guard supervision, (6) the legal bureau, (7) the motor pool, (8) radio repair, (9)

the pistol range, and (10) the fiscal office. The officers whose positions were filled by civilians were transferred to operational or field positions. They were not terminated and did not receive reductions in rank or salary.

At the time of the reorganization, the City was a party to collective negotiations agreements covering the terms and conditions of employment of police officers. In September 1993, the Jersey City Police Officers Benevolent Association (POBA), which represents the bargaining unit for police ranked lower than sergeant, and the Jersey City Police Superior Officers Association (PSOA), which represents the bargaining unit for supervisory police officers holding the rank of sergeant through deputy chief, each filed unfair practice charges against the City. Both unions alleged that the City violated *N.J.S.A.* 34:13A–5.4(a) by unilaterally transferring to civilians work traditionally performed by police officers and police superior officers. That statute provides in relevant part:

a. Public employers, their representatives or agents are prohibited from:

(1) Interfering with, restraining or coercing employees in the exercise of rights guaranteed to them by this act.

. . . .

(5) Refusing to negotiate in good faith with a majority representative of employees in an appropriate unit concerning terms and conditions of employment of employees in that unit. . . .

[<em>N.J.S.A.</em> 34:13A–5.4(a)(1), (5).]

PSOA further alleged that the non-negotiated transfers violated the terms of its collective negotiations agreement (Agreement) with the City. That Agreement provided in pertinent part:

Section 1. All conditions of employment relating to wages, hours of work and general working conditions presently in effect which are department-wide in nature shall be maintained. . . .

Section 3. Proposed new rules or modification of existing rules governing working conditions which are ... department-wide in nature shall be negotiated with the duly authorized representative of the [PSOA] before they are established.

Additionally, PSOA relied upon *N.J.S.A.* 40A:9–154.1, which provides in part: "Every adult school crossing guard shall be under the supervision and direction of the chief of police or other chief

law enforcement officer of the municipality wherein he is appointed...."

The cases were consolidated and hearings were held in July and November 1994 before PERC. The hearing examiner made findings of fact, rejected the City's argument that all of the job transfers were part of an overall, systematic reorganization, and conducted a job-by-job review and drew job-by-job conclusions. In general, the hearing examiner determined that the police department was "civilianizing" the force to maintain the resources of the Department, and intended to "reduce crime or the fear of crime in Jersey City" by improving the level of service and increasing the number of police officers in field positions. At the time of the hearing examiner's findings, 67% of police officers were in operational positions; the goal was to increase that number to 85% by "civilianizing" administrative police positions.

With respect to the specific departmental functions at issue, the hearing examiner made the following findings:

A. Mail delivery

For at least 18 years, police officers picked up and delivered intra- and inter-departmental mail using a marked police car. They also distributed subpoenas to officers for court appearances and picked up money at the car pound every day and delivered it to the Chief of Police. Occasionally, as a courtesy to fellow officers, they picked up evidence and delivered it to the property room. In September 1993, mail duty officers were transferred to patrol duty and mail duties were assigned to civilian employees. One of the displaced officers was required to return temporarily to mail duty because "civilian delivery of police mail was not functioning properly." That officer was returned to patrol duty later that year.

Although the police mail delivery system had historically been operated exclusively by the Police Department, civilians delivered intra- and inter-departmental mail in other City departments. By transferring the police mail delivery to civilians, the City was doing no more than consolidating governmental functions. The

City had no obligation to negotiate because consolidation is a managerial prerogative.

B.   Bureau of Criminal Identification (BCI)

In 1985, there were 14 police officers in the BCI. Five were on the day tour, five on the evening tour, and four on the midnight tour.   Their duties included checking FBI correspondence to verify fingerprint identification, fingerprinting civilians, processing (i.e., photographing and fingerprinting) prisoners, lifting latent prints from evidence delivered to the BCI, and going to crime scenes to secure latent evidence and take photographs.   There were also two civilian clerk typists.  The clerk typists would take telephone messages, answer mail, draw files, and prepare correspondence.  In spring 1994, two police officers in the BCI retired and, within a month, were rehired as civilians.  Except for going to crime scenes, the retired officers performed the same functions at the BCI as they performed when they were active officers.

The City's rehiring of retired police officers in the BCI occurred for purely economic reasons because the City attempted "to keep the same employees doing largely the same jobs for less pay," and was therefore not a legitimate reorganization.  The former officers performed "police-related duties" such as processing and fingerprinting prisoners.  The City was obligated to negotiate with the police unions before it shifted unit work.

C.   Desk assistants

The duties of station desk assistants included distributing handheld, two-way radios to officers going on patrol, acting as building security, sending duty notes to the dispatcher through the police computer, and writing incident reports when citizens come to the station to complain about such matters as domestic violence, stolen cars, and assaults.   In the summer of 1992, a civilian clerk began working next to the police officer serving as a desk assistant in the Jersey City–West District police station.  The task of taking and writing incident reports fell to the civilian clerk; the police clerk took reports only when the civilian clerk was busy.  In one station, a civilian clerk was hired to take the place of one of three police

clerks. In July 1994, one of the four police clerks in the South District retired and was immediately rehired as a civilian clerk. His duties as a civilian were the same as those he performed as a police officer. Because the "Jersey City police have historically shared certain clerical duties with civilians," a historical waiver existed and the City had no obligation to negotiate the transfer of clerical duties to civilian desk assistants.

D. Property room

Historically, police officers assigned to the property room collected evidence from the four Jersey City police districts and brought it to the central property room where it was catalogued and stored. In early 1994, two officers assigned to the property room retired and promptly were rehired as civilians. Those "retirees" did not collect evidence, but they did handle and record all evidence, including narcotics. The City's rehiring of retired police officers to work as civilians in the property room was an attempt "to keep the same employees doing largely the same jobs for less pay." As such, it was not a legitimate reorganization and the City was required to negotiate with the police unions.

E. School crossing guard supervision

Historically, police superior officers have supervised the City's civilian crossing guards. That supervision included pre-hiring background checks, making hiring recommendations, training crossing guards, and making sure that the guards are at their posts and in proper uniform. In August 1993, the police sergeant performing that supervision was replaced by a civilian. The "transfer of duties of the crossing guard supervisor to a civilian was not violative of the Act since the work transferred is supervisory in nature and therefore not mandatorily negotiable."

F. Legal bureau

For many years, the Police Department had its own legal bureau that was staffed by both police-officer attorneys and civilian attorneys. The civilian attorneys "worked with internal affairs and with the Police Director on various matters." The police attorneys reviewed documents signed by the Police Di-

rector, drafted policy directives for the Director, handled negotiations and contracts, prosecuted medical/psychological appeals of rejected police candidates, and served as hearing prosecutors in police disciplinary procedures. "Legal work" comprised no more than 15% of the legal bureau's work, however. "Most of the work was akin to senior staff advisor or administrative assistant." The legal bureau was abolished in September 1993 and its legal duties were transferred to the City's Corporation Counsel's office. The hearing officer dismissed without comment the unfair practice charge that centered around the abolition of the police legal bureau and the transfer of the bureau's legal duties to the City's Corporation Counsel.

G.   Motor pool

Three or four officers ran the motor pool for the Police Department. They made minor repairs, but were primarily responsible for the assignment of motor vehicles. Those duties were transferred to the City's Department of Public Works, the entity that maintains and repairs all of the City's other vehicles. Historically, the police motor pool was operated exclusively by police officers. However, the Department of Public Works repaired all of the City's other vehicles. Therefore, the transfer of police motor pool jobs to the Department of Public Works was a consolidation of government functions; the City had no obligation to negotiate.

H.   Radio repairs

Traditionally, three police officers in the support services division performed radio repairs. At the time of the hearing, the City sought to transfer that duty to the Department of Public Works. Finding "no evidence in the record that the City ever had facilities to repair civilian radios," the hearing examiner concluded that the plan to transfer police radio repair work to the Department of Public Works was not a consolidation of governmental functions and that the City was obliged to negotiate before transferring that unit work.

I. Pistol range

The City's police pistol range was staffed by a lieutenant and three police officers. The City replaced them with a civilian range master and two civilian range instructors. At the time of the hearing, the City sought to add a third civilian range instructor. The plan to staff the police pistol range with civilians was not a reorganization to improve efficiency, but rather was an attempt to lower costs. The City was obliged to negotiate before shifting that work to civilian employees.

J. Fiscal officer

The fiscal officer prepared the budget for the Department, maintained pension files, and handled purchasing requisitions. Sometime in 1993, the police officer in that position began using leave time so that he could attend law school. He was replaced by a civilian. The substitution of a civilian fiscal officer for a police fiscal officer was not a true reorganization; it was a displacement. Therefore, the City was obliged to negotiate with the police union before transferring that unit work.

In June 1996, PERC issued its decision and order. *In re City of Jersey City*, 22 *NJPER* ¶ 27131 (1996). PERC stated that the issue involved "questions of negotiability that have been carefully analyzed under the balancing test set forth by the Supreme Court" in *In re Local 195, IFPTE v. State*, 88 *N.J.* 393, 443 *A.2d* 187 (1982). PERC adopted the hearing examiner's findings of fact except to note that although at the time of the hearing examiner's report transfer of radio repair work had only been in the planning stage, since that time the Department of Public Works had begun doing police radio repair work. Observing that the shifting of work from employees within a negotiations unit to other employees outside the unit generally is a mandatory subject of negotiations, PERC stated that a City is relieved of its negotiation obligation if (1) the City has "exercised its managerial right to reorganize the way it delivers government services," (2) the union has "waived its right to negotiate over the transfer of unit work," or (3) "duties were historically performed by non-unit personnel

exclusively or in conjunction with unit employees." In this case, however, PERC determined that "no 'reorganization' controlled all the negotiability questions." Simply substituting one person for another "without changing the structure or the nature of the job" does not *"per se* eliminate a duty to negotiate over the transfer of duties to non-unit employees."

Applying those principles, PERC adopted all but two of the hearing examiner's legal conclusions. First, PERC noted that there was no evidence that police officers historically filled the position of fiscal officer. Therefore, contrary to the hearing examiner, PERC held that the City had no duty to negotiate the transfer of police fiscal duties to civilians. Secondly, PERC rejected the hearing examiner's conclusion that the negotiation obligation did not attach when purely supervisory duties were involved. Therefore, PERC held that the City had a duty to negotiate the substitution of a civilian for the police superior officer who supervised the crossing guards. In short, PERC held that the City had a duty to negotiate the transfer of jobs in the following areas: (1) the BCI, (2) the property room, (3) crossing guard supervision, (4) radio repair, and (5) the pistol range. The remaining allegations were dismissed. Finally, PERC ordered the City, pending negotiations with the POBA and the PSOA, to restore police officers to their former duties in the five functional categories in which the City unilaterally had transferred unit work, but that order was stayed pending resolution of this appeal. *In re City of Jersey City,* 22 *NJPER* ¶ 27168 (1996). PERC stressed that it was not ordering that police officers must perform those functions, but that the City must negotiate with the police unions before transferring such duties to civilians.

The City appealed from that part of PERC's decision finding negotiation obligations. In an unreported decision the Appellate Division affirmed "substantially for the reasons set forth" by PERC. The court first noted that it may not disturb an agency determination unless the decision was arbitrary, capricious or unreasonable, or unless it violates a legislative policy expressed or

implied in the act governing the agency. The court observed that, pursuant to *N.J.S.A.* 34:13A–5.4(d), PERC is authorized to determine whether a matter in dispute is within the scope of collective negotiations. The court stated that PERC applied the three-part test set forth in *Local 195, supra,* 88 *N.J.* at 401, 443 *A.*2d 187, and determined that the transfer of jobs in each of the five disputed areas is negotiable because (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially pre-empted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. Finally, the court rejected the City's argument that if negotiations over the transfers came to an impasse the City would be faced with binding arbitration and could be forced to restore police officers retroactively to positions that did not warrant being filled by police officers.

## II

The judicial role when reviewing an action of an administrative agency is generally restricted to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policy to the facts, the agency erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [*In re Musick,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996) (citing *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963)).]

In the absence of constitutional concerns or countervailing expressions of legislative intent, we apply a deferential standard of review to determinations made by PERC. *In re Hunterdon County Bd. of Chosen Freeholders,* 116 *N.J.* 322, 329, 561 *A.*2d 597 (1989); *see also State v. State Troopers Fraternal Assoc.,* 134 *N.J.* 393, 401, 634 *A.*2d 478 (1993) (stating that Court reviews PERC determinations with "appropriate deference").

The Legislature has vested PERC with "the power and duty, upon the request of any public employer or majority representa-

tive, to make a determination as to whether a matter in dispute is within the scope of collective negotiations." *N.J.S.A.* 34:13A–5.4(d). The standard of review of a PERC decision concerning the scope of negotiations is "thoroughly settled. The administrative determination will stand unless it is clearly demonstrated to be arbitrary or capricious." *Hunterdon County, supra,* 116 *N.J.* at 329, 561 *A.2d* 597 (quoting *State v. Professional Ass'n of N.J. Dep't of Educ.,* 64 *N.J.* 231, 258–59, 315 *A.2d* 1 (1974)).

## A

In *Local 195, supra,* 88 *N.J.* at 404–05, 443 *A.2d* 187, the Court detailed the fundamental test for the negotiability of subjects between public employers and employees:

[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

Applying that test to the facts before it, the Court held that to the extent that a provision in a contract included negotiation on the ultimate substantive decision to subcontract, it was a nonnegotiable matter of managerial prerogative. *Id.* at 408, 443 *A.2d* 187. To hold otherwise and to impose a legal duty on the State to negotiate all proposed instances of subcontracting would "transfer the locus of the decision from the political process to the negotiating table, to arbitrators, and ultimately to the courts. The result of such a course would significantly interfere with the determination of governmental policy and would be inimical to the democratic process." *Ibid.*

Nevertheless, when a decision to subcontract will result in a layoff or job displacement, a public employment contract may include a provision requiring the State to discuss its decision to

subcontract when "the proposed subcontracting is based on solely fiscal considerations." *Id.* at 409, 443 *A.*2d 187. "Replacing public employees with private employees solely to save money does entail a choice about the level of government spending, a matter of great public concern. However, discussion about such a replacement would not significantly interfere with the determination of public goals." *Id.* at 410, 443 *A.*2d 187. In fact, "such discussions would be in the public interest, since [public] employees could demonstrate that they would do. the same work more efficiently than a private contractor." *Ibid.*

Further, "[t]o the extent the provisions impose a duty on the State to negotiate procedural aspects of the subcontracting decision as they affect [public] employees, the clauses are negotiable." *Ibid.* For example, "negotiation could occur on the issue of adequate notice to employees that are going to be laid off." *Ibid.* Negotiation about such procedures will not significantly interfere with the underlying policy determination and are therefore negotiable terms of employment. *Ibid.* The Court emphasized that its holding did not "grant the public employer limitless freedom to subcontract for any reason." *Id.* at 411, 443 *A.*2d 187. A public employer could not subcontract in bad faith "for the sole purpose of laying off public employees or substituting private workers for public workers. State action must be rationally related to a legitimate governmental purpose." *Ibid.*

The Court next addressed the negotiability of transfer and reassignment provisions in the contract. The contract defined transfer as "the movement of an employee from one job assignment to another within his job classification in another organizational unit or department" and defined reassignment as "the movement of an employee from one job assignment to another within his job classification and within the work unit, organizational unit, or department." *Id.* at 414, 443 *A.*2d 187. The Court stated that the union satisfied the first prong of the negotiability test because the location and nature of an employee's work intimately and directly affects the employee's work and welfare.

*Id.* at 415, 443 *A*.2d 187. The Court found that the subject at issue was not preempted by statute or regulation. *Id.* at 416, 443 *A*.2d 187.

Finally, in determining whether the transfer and reassignment provisions would significantly interfere with the determination of governmental policy, the Court stated that the *substantive* decision "to transfer or reassign an employee is preeminently a policy determination. The power of the employer to make the policy decision would be significantly hampered by having to proceed through negotiation." *Id.* at 417, 443 *A*.2d 187 (citing *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 156, 393 *A*.2d 278 (1978)). However, negotiations about the *procedures* for implementing transfers and reassignment "will not significantly interfere with the underlying substantive policy determination." *Ibid.*

## B

Application of the first part of the *Local 195* negotiability test, whether the subject intimately and directly affects the employee's work and welfare, reveals that although no officers have lost their jobs as a result of the City's actions, "civilianization" has had a negative impact on some officers. For example, Officer Czachorowski, a patrolman who works in BCI, testified that the presence of the two civilians "severely reduces" the opportunities of the remaining officers to bid for desired work schedules. Further, PERC observed that, theoretically, civilianization diminishes the officers' "overtime opportunities." We are satisfied that the police officers meet the first prong of the *Local 195* negotiability test.

We regard the critical issue to be the third standard of the *Local 195* negotiability test, which concerns whether negotiations would "significantly interfere with the determination of governmental policy." We need not address the second part of the test, whether the subject is preempted by statute or regulation, because of our conclusion that the "interference with governmental policy" standard is dispositive.

To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy,

it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

[*Local 195, supra,* 88 *N.J.* at 405, 443 *A.*2d 187.]

In a non-police context, we have held that the "substantive decision to transfer or reassign an employee is preeminently a policy determination. The power of the employer to make the policy decision would be significantly hampered by having to proceed through negotiation." *Id.* at 417, 443 *A.*2d 187 (citing *Ridgefield Park, supra,* 78 *N.J.* at 156, 393 *A.*2d 278).

In a police context, we have interpreted statutes to reflect a legislative intent to vest discretion in municipalities to demote or lay-off police for economic reasons. See *Paterson Police PBA Local No. 1 v. City of Paterson,* 87 *N.J.* 78, 97–98, 432 *A.*2d 847 (1981)(discussing *N.J.S.A.* 40A:14–143, which provides: "The governing body of any municipality, if they shall deem it necessary for reasons of economy, may decrease the number of members and officers of the police department or force or their grades or ranks"). We concluded that "[m]unicipal decisions about how to organize and deploy their police forces to comply with economic needs are unquestionably policy decisions and affect the public welfare," and are therefore not negotiable. *Id.* at 98, 432 *A.*2d 847. Other jurisdictions have come to the same conclusion concerning the deployment of police officers and other service personnel. *See, e.g., City of Boston v. Boston Police Superior Officers Fed'n,* 9 *Mass.App.Ct.* 898, 402 *N.E.*2d 1098, 1099 (1980) (finding inherent managerial prerogative to appoint, assign, organize, and transfer police officers); *City of Philadelphia v. Pennsylvania Labor Relations Bd.,* 138 *Pa.Cmwlth.* 113, 588 *A.*2d 67, 72 (finding managerial prerogative to decide what level of emergency protection to provide and what amount of money to lay out), *appeal denied,* 528 *Pa.* 632, 598 *A.*2d 285 (1991); *International Ass'n of Fire Fighters, Local Union 1052 v. Public Emp. Relations*

*Comm'n,* 113 *Wash.*2d 197, 778 *P.*2d 32, 36–37 (1989) (*en banc*) (stating that elected officials must have flexibility to determine amount of services to be delivered; regardless of size of police force, amount of services is basic managerial decision that ultimately must be determined by voting public through elected representatives).

Further, the courts and the Legislature have long recognized that because police officers are different from other public employees, the scope of discretion accorded to the public entities that administer police departments is necessarily broad. The Legislature has vested municipal authorities with the discretion to determine the powers, duties, functions, and efficient operation of police departments. *See N.J.S.A.* 40A:14–118 (establishing municipal power to create, maintain, and control own police force). In *State Troopers Fraternal Ass'n, supra,* 134 *N.J.* at 417, 634 *A.*2d 478, we held that negotiability of statutorily mandated disciplinary review procedures did not apply to the Division of State Police because "negotiability of such procedures would infringe unacceptably on one of the most important managerial prerogatives" of the State Police Superintendent. *See also Irvington Policemen's Benevolent Ass'n, Local No. 29 v. Town of Irvington,* 170 *N.J.Super.* 539, 545–46, 407 *A.*2d 377 (App.Div.1979) (taking judicial notice that "the role of the police in every community has always been of extreme importance to our social well-being" and noting that in "this obscure area of what constitutes a managerial prerogative, the importance of managing a police department cannot be equated with the need of a board of education to unilaterally fix the working hours of its secretaries"), *certif. denied,* 82 *N.J.* 296, 412 *A.*2d 801 (1980); *Borough of Atl. Highlands v. Atlantic Highlands PBA Local 242,* 192 *N.J.Super.* 71, 75–76, 469 *A.*2d 80 (App.Div.1983) (noting "special position of policemen" and finding non-negotiable proposed item of negotiation that would "negatively affect the current level of efficiency in the deployment of [the municipality's] police force"); *Township of Moorestown v. Armstrong,* 89 *N.J.Super.* 560, 566, 215 *A.*2d 775 (App.Div.1965) (noting that "[i]t must be recognized that a police officer is a special

kind of public employee"), *certif. denied,* 47 *N.J.* 80, 219 *A.*2d 417 (1966); *Caronia v. Civil Serv. Comm'n,* 6 *N.J.Super.* 275, 279, 71 *A.*2d 135 (App.Div.1950) (noting that "regulation of the police force by assignment of its members to particular duties, according to the requirements of the service and the special fitness of the individual members for these duties, must certainly be left to the discretion of the appointing authority, if they are to have any control or any liberty to act for the promotion of the efficiency of their department"); *Gutheil v. Nelson,* 86 *N.J.L.* 1, 3, 91 *A.* 93 (Sup.Ct.1914) (holding that police officer "holds [his] assignment subject to be transferred from one line of duty to another" whenever municipality "shall determine it to be for the public interest"), *aff'd,* 87 *N.J.L.* 691, 94 *A.* 1101 (Err. & App.1915); *State v. Board of Police Comm'rs of the City of Newark,* 49 *N.J.L.* 175, 176, 6 *A.* 882 (1886) (noting that if "questions of precedence and preference among the members of the police force are to be settled by hearing on evidence and argument, there can be no proper subordination,—no selection or preference for skill or aptitude for special service. The hindrance and restraint on the [municipality] would defeat, rather than promote, the efficiency of the police force").

■ In this case, PERC found that economic reasons motivated the City to redeploy police officers and fill their vacated positions with civilians. Conversely, the City contended that its actions were undertaken for the purpose of increasing the number of officers in operational positions and thereby reducing the incidence or fear of crime. We conclude that the record supports the City's position that its actions were not taken primarily for economic reasons, but rather to augment the City's ability to combat crime by increasing the number of police officers in field positions. Because the City implemented the reorganization primarily for the purpose of improving the Department's effectiveness and performance, the City's actions constitute an inherent policy determination that would, under *Local 195, supra,* and *N.J.S.A.* 40A:14–118, be impermissibly hampered by negotiations.

We therefore hold that, under the third prong of the *Local 195* negotiability test, a negotiated agreement would significantly interfere with the City's managerial prerogative to determine governmental policy.

### C

Although PERC's decision in this case stated that it analyzed the facts in accordance with the three-part negotiability test set forth in *Local 195*, we are satisfied that PERC did not literally apply that test. In response to the contention that *Local 195*'s negotiability test must be applied explicitly to the facts of this case, PERC argues that if that test had to be applied in every dispute the negotiability of all well-established employment conditions would have to be redetermined case-by-case and fact-by-fact. PERC contends that such an approach would destroy predictability in determining negotiations rights and duties, breed litigation, and undermine labor relations stability. Additionally, PERC asserts that application of the negotiability test would improperly inject PERC into the merits of every negotiations issue because application of the test would require PERC to determine in every dispute whether the interests of the employees or the employers predominated.

We find PERC's argument to be at odds with precedent. In *Paterson Police, supra,* 87 *N.J.* at 93, 432 *A.*2d 847, we concluded that "[o]nly case-by-case determinations will give further meaning and substance" to the principle of managerial prerogative and that "PERC and our courts are capable of making such determinations as individual cases arise." *See also State Troopers Fraternal Ass'n, supra,* 134 *N.J.* at 401, 634 *A.*2d 478 (stating that courts "need to determine on a case-by-case basis the subjects that are mandatorily negotiable"); *Board of Educ. of the City of Englewood v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 7, 311 *A.*2d 729 (1973) (stating that lines between negotiability and non-negotiability are obscure and must be drawn case by case); *In re Township of Mt. Laurel,* 215 *N.J.Super.* 108, 114, 521 *A.*2d 369 (App.Div.

1987) (finding that whether government interest is dominant over that of employees "is a fact intensive determination which must be fine-tuned to the details of each case"); *Borough of Atl. Highlands, supra,* 192 *N.J.Super.* at 77, 469 *A.*2d 80 (stating that differing facts of each case should determine whether disputed subject is mandatorily negotiable); *Irvington Policemen's Benevolent Ass'n, supra,* 170 *N.J.Super.* at 544, 407 *A.*2d 377 (stating that lines between negotiable and non-negotiable subjects are "nebulous" and "each case must be decided upon its own particular facts on a case-by-case basis"), *certif. denied,* 82 *N.J.* 296, 412 *A.*2d 801 (1980). We therefore conclude that PERC should have applied the *Local 195* negotiability test to the unique facts of this case.

■ In defense of its emphasis on the "unit work rule" rather than the *Local 195* negotiability test, PERC argues that the unit work rule and its exceptions were developed through application of this Court's negotiability tests. The unit work rule, which predates this Court's decision in *Local 195,* provides that, subject to three exceptions, "the shifting of work from employees within a negotiations unit to other employees outside the unit is a mandatory subject of negotiations." *In re City of Jersey City, supra,* 22 *NJPER* ¶ 27131. The crux of PERC's argument, however, is that it had been applying the unit work rule both before and after our decision in *Local 195* and the Appellate Division has never reversed a PERC decision for failure to apply the *Local 195* standards rather than the unit work rule.

Although we hold that the *Local 195* negotiability test controls and that the transfer of officers to operational positions is not a subject of negotiation, we note that we would reach the identical result if we applied the unit work rule. The unit work rule, which has its underpinnings in federal private-sector labor law, *see Fibreboard Paper Prods. Corp. v. NLRB,* 379 *U.S.* 203, 85 *S.Ct.* 398, 13 *L. Ed.*2d 233 (1964), provides that an employer must negotiate before using non-unit employees to do work traditionally performed by unit employees alone. In *Fibreboard, supra,* the Supreme Court construed the National Labor Relations Act to

reflect a congressional determination that an employer must engage in collective bargaining before contracting out work previously performed by members of the bargaining unit. *Id.* at 214, 85 *S.Ct.* at 404, 13 *L. Ed.*2d at 240. Typically, the rule applies to require collective bargaining before workers in the bargaining unit are replaced by non-unit workers, the objective being to provide the union with at least an opportunity to negotiate an acceptable alternative, one that would not result in loss of jobs and reduction in union membership. In this matter, no job losses are contemplated because the police officers performing non-police duties are being reassigned to police work. Their replacements, however, cannot be represented by the unions, which represent only police officers, and thus the possible reduction in union membership is merely coincidental. Accordingly, the concerns that inspired the unit work rule are not fully implicated in Jersey City's plan to reorganize the police department.

PERC has consistently applied the unit work rule not only to disputes between public employers and employees in general, but also specifically to cases involving police officers. *See, e.g., In re City of Newark,* 23 *NJPER* ¶ 28266 (1997) (denying police union's request for interim order prohibiting city from transferring certain police duties to civilians because union could not show irreparable harm resulting from transfer of unit work); *In re Borough of Bogota,* 23 *NJPER* ¶ 28165 (1997) (applying unit work rule and granting police union's request for interim order restraining borough from transferring exclusive police dispatch functions to civilian employees); *In re County of Bergen,* 17 *NJPER* ¶ 22129 (1991) (finding county violated unit work rule by unilaterally assigning radio and teletype communications functions traditionally performed by sheriff's officers to lower paid non-unit civilian personnel); *In re City of Newark,* 14 *NJPER* ¶ 19125 (1988) (applying unit work rule and holding that police union's grievance, alleging that city violated contract by assigning police dispatching work to non-unit communications clerks, was arbitrable because it involved work-preservation issues); *In re Township of Mine Hill,* 13 *NJPER* ¶ 18056 (1987) (holding mandatorily negotiable con-

tract provision that stated: "No post presently filled [by a police officer] shall be covered by any non-police officer"); *In re Borough of Paramus,* 11 *NJPER* ¶ 16178 (1985) (holding that police proposal concerning preservation of unit work was mandatorily negotiable where proposal sought only to prevent overtime opportunities from being assigned to non-unit employees of borough); *In re Township of Washington,* 9 *NJPER* ¶ 14183 (1983) (finding that replacement of police personnel by non-unit township employees was mandatorily negotiable under unit work rule because negotiation would not "significantly interfere with the Township's ability to make assignments or determine the number of employees required to perform a function").

PERC recognizes three exceptions to the rule that the transfer of unit work is mandatorily negotiable: (1) the union has waived its right to negotiate over the transfer of unit work, (2) historically, the job was not within the exclusive province of the unit-personnel, and (3) the municipality is reorganizing the way it delivers government services. *In re North Arlington Bd. of Educ.,* 23 *NJPER* ¶ 28077 (1997); *In re State Dep't of Law & Public Safety,* 20 *NJPER* ¶ 25032 (1994); *In re Township of Nutley,* 11 *NJPER* ¶ 16116 (1985).

The first exception to the unit work rule provides that a public employer does not have to negotiate the shifting of work from unit employees to non-unit workers if the union has waived its right to negotiate. *In re North Arlington Bd. of Educ., supra,* 23 *NJPER* ¶ 28077. A waiver "can come in a number of different forms," but it "must be clear and unmistakable." *Ibid.* For example, "if the contract explicitly and unmistakably allows the employer to make the changes," the union has no right to negotiate over the shifting of unit work. *In re Monmouth County Sheriff,* 18 *NJPER* ¶ 23201 (1992). Similarly, consistent past practice to which no objection has been made operates as a waiver. *See, e.g., In re New Jersey Transit Bus Operations, Inc.,* 14 *NJPER* ¶ 19211 (1988) (finding union's right to negotiate over transfer of jobs to another union was extinguished by thirteen-

year hiatus in offering service); *In re South River Bd. of Educ.,* 12 *NJPER* ¶ 17167 (1986) (finding union waived right to negotiate school board's reduction of part-time teacher's hours and wages where such conduct was consistent with past practice); *In re Rutgers, the State Univ.,* 8 *NJPER* ¶ 13132 (1982) (finding union waived right to negotiate over employer's policy of not permitting members to work on January 2 when policy had been in place for nine years and union had not previously objected).

We conclude that PERC was correct in finding that the police unions had not waived their right to negotiate over the transfer of the disputed positions. There was no evidence that there was either a contractual waiver or an implied waiver due to lapse of time or acquiescence.

The next exception to the unit-work rule states that a public employer need not negotiate when it transfers to one unit more of the job duties that the unit historically has performed in conjunction with another unit. *See, e.g., In re State Dep't of Law & Public Safety, supra,* 20 *NJPER* ¶ 25032 (state did not violate negotiation obligation where it laid off civilian communications operators and assigned work to non-unit state troopers who had "historically performed communications work in conjunction with the operators"); *In re Town of Dover,* 15 *NJPER* ¶ 20112 (1989)(town did not violate negotiation obligation where it laid off civilian dispatchers and assigned work to non-unit police officers who had previously performed dispatching functions). In the instant case, the Commission found that the only areas where the police officers had historically shared duties with civilians were the positions of desk assistant, fiscal officer, and attorney in the police legal bureau. We find that there is no evidence in the record that the Jersey City police have historically performed any other functions in conjunction with civilians. Therefore, PERC was correct in finding that that exception did not apply to the job transfers at issue on this appeal.

The final exception, whether a public employer's actions will be deemed to constitute a legitimate reorganization, depends

both on the employer's motivations and whether there is a change in the delivery of services. In *In re Township of Nutley, supra*, 11 *NJPER* ¶ 16116, PERC held that the municipality had a non-negotiable managerial prerogative both to replace a patrolman in the Traffic Safety Unit with a civilian and to transfer the displaced officer to operational duties. The municipality contended that the change was motivated partly by the fact that the civilian would receive $21,000 less in salary and partly by the desire to put another patrolman in a field position. PERC accepted those arguments, but found dispositive the fact that there was not a mere replacement of an officer by a civilian. Rather, there was a basic change in the structure of the Traffic Safety Unit because the civilian, unlike her predecessor, would spend only half of her shift in the Traffic Safety Unit and would spend the remainder of her day performing clerical duties in the Office of the Chief of Police.

Similarly, in *In re Township of Maplewood*, 11 *NJPER* ¶ 16183 (1985), PERC held that a municipality has a managerial prerogative to consolidate the dispatching functions of its police and fire departments and to employ civilian dispatchers in order to have "more police officers and fire fighters available for line duties." *See also In re Town of Kearny*, 23 *NJPER* ¶ 28164 (1997)(denying police union's request for restraining order where town attempted to eliminate position of police auto mechanic and to transfer duties to civilians in a "central garage" to service all township vehicles). In *In re County of Essex*, 18 *NJPER* ¶ 23124 (1992), the hearing examiner held that the County was within its rights when it unilaterally fired police officers and transferred their job responsibilities to their counterparts in the County Sheriff's Department. The examiner found that the County had acted pursuant to a study that revealed that the then-existing structure encouraged duplication of work, stimulated excess overtime, condoned unnecessary specialization and impeded the goals of good government. He found dispositive the fact that the County and the County Sheriff are separate and distinct public employers. *Ibid.; see also In re County of Hudson*, 22 *NJPER* ¶ 27204 (1996) (denying

police union's request for restraining order where county attempted to "reorganize" its police force by abolishing it and transferring work to County Sheriff's Department because of "severe financial difficulties").

Alternatively, there are several cases in which PERC found that a municipality's claimed "reorganization" was nothing more than a shifting of work out of the unit, and was therefore negotiable. In *In re Toms River Education Association*, 17 *NJPER* ¶ 22056 (1991), the School Board, after the voters rejected its operational budget, eliminated the position of Department Chairperson, transferred the displaced chairpersons into full-time teaching positions, and had principals assume the supervisory duties of the chairpersons. The Board admitted that its sole purpose was to save money. In finding the changes mandatorily negotiable, the hearing examiner reasoned that because the changes " 'were necessitated by the budget cut' then *a fortiori* the Board's decision was motivated by mandatorily negotiable economic factors and did not involve non-negotiable departmental reorganization . . . in furtherance of a major educational policy." *Ibid.; see also In re Borough of Bogota*, 23 *NJPER* ¶ 28165 (1997) (granting police union's request for restraining order where municipality's transfer of dispatching functions from police to civilians was done "purely to effect economic savings"); *In re County of Bergen*, 17 *NJPER* ¶ 22129 (1991) (finding county's elimination of positions in Sheriff's Department and replacement of officers with civilians impermissible because claimed reorganization was nothing more than plan to save money and because county did not change nature of services rendered). Those cases are premised on the notion that if money is the only issue, then the public employer must first attempt to negotiate efficiency or cost savings measures with the union before transferring the work to lower paid employees in a different negotiations unit. *See In re Bergen Pines County Hosp.*, 17 *NJPER* ¶ 22102 (1991).

█ Thus, in order to succeed on a reorganization defense, the public employer is required to prove that there was a change in

the way services were delivered and that the change was not motivated purely by economic reasons. Applying that principle to the instant case, PERC held that the reorganization exception was germane only to the mail delivery and motor pool positions. PERC found that the City had civilians in other departments who were already delivering mail and fixing cars, and that by eliminating those positions within the police department the City was merely trying to consolidate its operations. PERC did not find that any of the City's other actions constituted a valid reorganization.

PERC viewed the City's actions not as part of an overall reorganization of the municipality's police force, but rather as "discrete" actions that should be examined on a "job-by-job basis." Doing so minimized the significance of the City's hiring of a consulting firm and revising its organization of employees in an attempt to increase the percentage of the police force engaged in operational duties. Further, when focusing on the discrete actions the City took with regard to the pistol range, the property room, the BCI, and radio repairs, PERC found that the City undertook these changes for reasons that were "simply economic." However, there was no testimony at the hearing concerning either the salaries of the police officers or the salaries of the civilians who replaced them.

Moreover, the conclusion that the City's actions primarily were economically motivated is at odds with PERC's finding that the City undertook the reorganization to reduce crime by putting more officers into operational positions. Further, PERC invalidated the City's attempted reorganization of the contested positions because it found that the City had merely substituted a non-unit employee for a unit employee with no change in the responsibilities or duties attendant to the position. Normally, the employer is required to negotiate such a change in order to give the union a chance to demonstrate how its members can perform the job with greater efficiency or for less money. *See Bergen Pines, supra,* 17 *NJPER* at 22102. Such a negotiation does not impair

the public employer's ability to manage because, if money is the ultimate issue for the employer, the employer will not be concerned with who performs the job as long as it is performed in a manner that will effectuate cost savings. However, that rationale for prohibiting a shifting of unit work does not apply where the purpose of the change is not to save money, but rather to free up more police personnel for field jobs. Unlike a reorganization driven by economic concerns, the City here is concerned specifically with who performs the job and has determined that trained police personnel can most effectively be deployed in jobs that directly involve the investigation of crime and the apprehension of criminals. We therefore conclude that neither the evidence nor the policy rationale requiring negotiations when work is shifted out of a bargaining unit for economic reasons supports PERC's determination that the City's actions were exclusively or even primarily economically motivated and thus subject to negotiation.

### III

To summarize, we reverse the judgment of the Appellate Division on the ground that the City's actions constitute a nonnegotiable managerial prerogative under the *Local 195* negotiability test. Additionally, we hold that PERC should not have applied the unit work rule, but that even under that rule we would reach the same result because the City's actions fall within the reorganization exception to that rule. The City was not required to negotiate the shifting of unit work because the City's actions were neither exclusively nor primarily economically motivated.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.