**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5280-18

IN THE MATTER OF
BENJAMIN RUIZ, CITY OF
PERTH AMBOY,
DEPARTMENT OF PUBLIC
SAFETY.

_____

Submitted February 3, 2021 – Decided April 9, 2021

Before Judges Sumners and Geiger.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2016-4436 and 2019-673.

Mets Schiro & McGovern, LLP, attorneys for appellant (James M. Mets, of counsel and on the briefs; Kevin P. McGovern, on the briefs).

King, Moench, Herniak & Mehta, LLP, attorneys for respondent City of Perth Amboy (Peter J. King, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Jonathan S. Sussman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

This appeal requires us to determine whether to uphold the final agency decision by the Civil Service Commission (Commission) adopting the Administrative Law Judge's (ALJ) initial decision recommending the termination of appellant Benjamin Ruiz's employment as the Chief of Police for the City of Perth Amboy (City) due to misuse of public property, insubordination, and conduct unbecoming of a public employee. Although, a criminal jury found Ruiz not guilty of official misconduct, theft of services, and witness tampering, and the same underlying facts were presented by the City, we affirm Ruiz's termination. However, we remand for the Commission to determine if Ruiz is entitled to back pay.

I.

Ruiz was hired as a patrol officer by the City in 1988 and ultimately became chief of police in 2012. The administrative record of the pertinent incidents and procedural history resulting in his termination are as follows.

A. Mustang Repair

In December 2013, Ruiz was driving his Mustang convertible in a civic Christmas parade when the vehicle broke down. City Police Lieutenant Andy Montalvo testified that, at Ruiz's request, he contacted auxiliary officer Robert

O'Buck to have the vehicle towed to the police garage. Ruiz denied instructing Montalvo or O'Buck to tow the Mustang to the police garage.

City auto mechanic Angel Velez testified that Ruiz told him the vehicle's clutch needed to be replaced. Considering this an order to inspect and fix the car, Velez put the Mustang on a garage lift and confirmed Ruiz's assessment. Ruiz told Velez that he would be ordering the parts for the Mustang. After receiving the parts, according to Velez, Ruiz instructed him to install them. Velez complied and, during working hours, installed the parts in the Mustang, taking about an hour and a half. When he finished, Velez drove the vehicle to Ruiz's mother's residence, where it was typically stored.

Miguel Garcia, another city auto mechanic, testified he saw Ruiz place a box containing the parts on Velez's desk, stating "[g]et it done" and "[f]inish the car up." Garcia videotaped Velez performing the work.

B. Motorcycle Repair

In 2003, Ruiz purchased a personal motorcycle for departmental use, with the approval of the City's mayor, because the City did not have the funds to buy the motorcycle. The motorcycle, registered and insured in Ruiz's name, was stored in the police garage. It was used in parades, funerals, and special events

3

related to Ruiz's duties as member of the police department. Ruiz testified he "[n]ever" used the motorcycle for personal purposes.

In April 2014, after Montalvo complied with Ruiz's request to research and purchase fans, pipes, and tips for the police department's motorcycles, Montalvo instructed Garcia to install some of the parts on Ruiz's motorcycle. According to Garcia, while he was working on the department's motorcycles, Ruiz asked him, "[w]hen [is] mine going to get done?" After Garcia completed repairing Ruiz's motorcycle, Ruiz was pleased with the job.

Ruiz later wrote a July 8, 2014 check, in the amount of $768, to the city to cover the parts purchased by the city and installed in his motorcycle. This was confirmed by Jill A. Goldy, the Chief Financial Officer for the City.[1]

C. Buick Repair

In the summer of 2014, an individual contacted Ruiz about problems with the air conditioner in the individual's green Buick. Ruiz told Velez that a non-municipal vehicle would be coming into the City garage to be looked at. Ruiz asked Velez to inspect the vehicle's air conditioning system, and City equipment was later used to repair the vehicle. Garcia observed Velez put anti-freeze in

---

[1] Goldy's testimony is not included in the transcripts included in the record; this fact is adduced from the ALJ's initial decision.

the vehicle.[2]    After reviewing security camera footage corroborating his testimony, Garcia indicated that it was contrary to departmental policy to repair personally owned vehicles.  The footage also depicted the vehicle outside the door of the police garage with a group of people, including Ruiz, standing around it.

D. Convenience Store Incident

Sometime in 2015, Phil Terranova, a former City police captain who managed the detective bureau, was dispatched with another officer to investigate questionable activity at a local convenience store.[3]  The store manager informed him that individuals were not permitted to be in an area behind the store but that a man identifying himself as a police detective went behind the store.  In looking behind the convenience store, Terranova noticed a fence with two holes in it, providing a view of a street behind the store.  Terranova was not aware of any active investigations in that area and surmised the manager's description of the man fit Ruiz.  At the time, Ruiz was suspended without pay from the police

---

[2]  Garcia was not aware if Ruiz asked Velez to put anti-freeze in the car.

[3]  The approximate date was not disclosed in Terranova's testimony, but it was prior to his retirement in 2016 and after Ruiz was suspended in December 2014.

A-5280-18

department and was required to turn in his police identification and badge as well as his service weapon to the department.

A subsequent investigation, including a surveillance video, revealed Ruiz was going to the back of the store to look through the holes in the fence. After learning that Ruiz's secretary lived on the street behind the fence, Terranova informed her there were concerns that Ruiz was surveilling her home through the fence holes.[4] Carl Graham, Jr., a former City police lieutenant, who also involved in the investigation, testified he was told by the convenience store manager that the man displayed a badge and identified himself as a police detective.

After conferring with the Middlesex County Prosecutor's Office (MCPO), Terranova obtained an arrest warrant and took Ruiz into custody on May 31, 2016. Found in one of Ruiz's rear pockets was a City police chief badge. Employees at the convenience store gave statements indicating Ruiz used a badge identifying himself as a police officer.

E. Criminal Proceedings

---

[4] Terranova testified there were rumors in the police department that Ruiz and his secretary were engaged in an intimate relationship.

On February 6, 2015, Ruiz was indicted by a Middlesex County Grand Jury arising from the Buick repair with: second-degree official misconduct, N.J.S.A. 2C:30-2(a), (b) (two counts); third-degree theft of services, N.J.S.A. 2C:20-8(b); and third-degree witness tampering, N.J.S.A. 2C:28-5(a)(1). A jury acquitted him of all charges on September 20, 2016.

On June 2, 2017, Ruiz was again indicted by a Middlesex County Grand Jury based on the convenience store incident. He was charged with: fourth-degree impersonating a law enforcement officer, N.J.S.A. 2C:28-8(b); fourth-degree stalking, N.J.S.A. 2C:12-10(b); and a petty disorderly persons offense of criminal trespass, N.J.S.A. 2C:18-3(b). A jury acquitted him of all charges on July 19, 2018.

F. Administrative Disciplinary Charges

On December 15, 2014, Ruiz was served with a preliminary notice of disciplinary action (PNDA) charging him with: conviction of a crime, N.J.A.C. 4A:2-2.3(a)(5); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); misuse of public property, including motor vehicles, N.J.A.C. 4A:2-2.3(a)(8); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12). These charges were all based on the pending charge of third-degree theft brought by the MCPO. Effective that same day, Ruiz was suspended with pay indefinitely.

A-5280-18

A week later, on December 23, 2014, Ruiz was served with another PNDA, charging him with the same causes set forth in N.J.A.C. 4A:2-2.3, based on the pending charge of third-degree theft of services charge brought by the MCPO.  Ruiz was suspended without pay indefinitely effective December 16, 2014.

On June 2, 2016, the City served Ruiz with a final notice of disciplinary action (FNDA) terminating him due to: insubordination, N.J.A.C. 4A:2-2.3(a)(2); conviction of a crime, N.J.A.C. 4A:2-2.3(a)(5);  conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); misuse of public property, including motor vehicles, N.J.A.C. 4A:2-2.3(a)(8); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12).  The FNDA also charged Ruiz with violating "Department Rules & Regulations pertaining to conduct unbecoming of [a] Perth Amboy Police Officer."  The FNDA included a document detailing various police departmental rules that Ruiz violated, for example, employees are "prohibited from using any department property, equipment, consumable supplies and other resources for personal business or pleasure" and required to "present an image of personal integrity and dependability in order to have the respect of the public."  Ruiz appealed the FNDA to the Commission.  Nearly

three months later, in September 2016, Ruiz was acquitted of his first indictment.

Following Ruiz's acquittal of his second indictment in July 2018, the City served Ruiz a second FNDA on August 29, 2018, charging him with: insubordination, N.J.A.C. 4A:2-2.3(a)(2); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); misuse of public property, including motor vehicles, N.J.A.C. 4A:2-2.3(a)(8); and other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12). As with the prior FNDA, Ruiz was charged with violating multiple departmental rules and regulations and reiterated that Ruiz was terminated as of June 7, 2016. Ruiz appealed this FNDA to the Commission. On November 19, 2018, Ruiz's appeal of both FNDAs were consolidated by the ALJ for the purposes of a contested hearing.

Following a three-day hearing, the ALJ issued an initial decision recommending to the Commission that Ruiz's termination should be upheld. The ALJ held that even though Ruiz was twice acquitted of criminal charges, the City had the right to pursue disciplinary action against him premised on the underlying conduct in the criminal charges. See In re Phillips, 117 N.J. 567, 575 (1990) ("[A] final judgment of conviction is essential to a finding of guilt based on a departmental disciplinary charge of having violated the criminal law.

9

The converse of that rule, however, does not apply.") (citation omitted); Sabia v. City of Elizabeth, 132 N.J. Super. 6, 12 (App. Div. 1974) ("the absence of a conviction, whether by reason of non[-]prosecution or even acquittal, bars neither prosecution nor finding of guilt for misconduct in office in the disciplinary proceedings"). The ALJ found that "[t]he testimony of the City's witnesses was credible and compelling[,]" as "[e]ach was straightforward, believable, and consistent." In contrast, she determined that Ruiz's testimony was "lacking in credibility" and "was not straightforward or believable." She noted that even Ruiz's own witness, O'Buck, contradicted Ruiz's testimony.

Based on the testimony and documentary evidence, the ALJ made the following findings:

- Ruiz's personal motorcycle, which he insured and kept in the police garage, was used for police department functions: funerals, escorts, and special events. Ruiz did not seek permission from the City Administrator and the City's insurance carrier to use the motorcycle for police business.

- Ruiz signed a March 13, 2014 City purchase order for parts for police department motorcycles that were installed on Ruiz's motorcycle. He later reimbursed the City to cover the parts with a July 8, 2014 check in the amount of $768.

- When Ruiz's Mustang broke down while he was driving it during a Christmas parade, his personal

10

mechanic O'Buck towed the vehicle and placed it inside in the police garage bay area without consulting with Ruiz. Ruiz subsequently purchased parts for the vehicle and asked Velez to repair the vehicle. After the vehicle was repaired, Velez drove it to Ruiz's mother's home.

- Employees were not permitted to use public funds to purchase personal items nor permitted to use a public purchase order for ordering personal items. Privately owned vehicles were not permitted in the police garage.

- Ruiz showed an employee of a convenience store his police badge, to show that he was on official police business. Because he was suspended at the time, he should not have been in possession of his badge.

The ALJ concluded that the charges of "conduct unbecoming of an employee, insubordination[,] and other sufficient cause," as well as "the charges pertaining to the violations of the Department's policies have been sustained." She held the City proved the charge of misuse of public property by establishing that Ruiz used taxpayer money to order parts for his personal motorcycle and used municipal personnel and facilities to repair and store his personal property, the Mustang. She held that the City proved the charges of insubordination, conduct unbecoming of an employee, and other sufficient cause, by establishing that Ruiz, while suspended, presented his badge to show he was a law enforcement officer to the convenience store workers. The ALJ found, however, that the

11

charge of neglect of duty was not established as there was no evidence, let alone a preponderance of the evidence, that Ruiz failed to perform his job duties.

Considering the seriousness of these charges and the high standard to which law enforcement officers are held, the ALJ recommended that Ruiz's termination was warranted. On June 26, 2019, the Commission "accepted and adopted the Findings of Fact and Conclusion [set forth] in the . . . [ALJ's] initial decision[,]" that the City's action in "removing [Ruiz] was justified."

## II.

On appeal, Ruiz argues that the Commission erred in upholding his termination because there was insufficient evidence to sustain the charges, progressive discipline short of termination should have been employed, and he was not served a PDNA before service of the second FDNA. Based on our review of the record and applicable law, Ruiz's contentions lack sufficient merit to warrant extensive discussion in a written opinion. R. 2:11-3(e)(1)(D) and (E). We therefore affirm substantially for the reasons stated by the ALJ in her cogent initial decision as adopted by the Commission. We add the following brief comments.

Appellate review of an administrative agency decision is limited. In re Herrmann, 192 N.J. 19, 27 (2007). A "strong presumption of reasonableness

attaches" to the Commission's decision.  In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994)).  Therefore, we generally defer to final agency actions, only "reversing those actions if they are 'arbitrary, capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole.'"  N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008) (alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).  We must defer even if we would have reached a different result.  In re Carter, 191 N.J. 474, 483 (2007) (citation omitted).  It is not our role to second-guess or substitute our judgment for that of the agency and, therefore, we do not "engage in an independent assessment of the evidence as if [we] were the court of first instance."  In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

It is without merit and disingenuous for Ruiz to contend that he could not be found to be insubordinate for failing to turn in his badge when he was suspended because he was not asked to do so.  As police chief, he was responsible for enforcing the departmental rules, which included the requirement that suspended police officers must turn in their badge and service

A-5280-18

weapon. Not doing so and using his badge to falsely represent that he was on official police business at the convenience store was clearly unbecoming conduct. He also displayed conduct unbecoming by storing his personal motorcycle in the police garage and having it and his Mustang repaired with police department funds and by police department employees. Ruiz's later reimbursement of the motorcycle parts' costs did not mitigate his use of public funds or public employees for personal gain.

Ruiz's assertion that dismissal was too severe a sanction under these circumstances due to his unblemished twenty-five-year record is unpersuasive. Our Supreme Court has held "the theory of progressive discipline [is not] a fixed and immutable rule to be followed without question. Instead, it has recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record." Carter, 191 N.J. at 484. Thus, "the question for the courts is 'whether such punishment is 'so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Ibid. (internal quotations and citation omitted). The doctrine of "progressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the misconduct is severe, when it is unbecoming to the employee's position or

14

renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Herrmann, 192 N.J. at 33; see also Karins v. City of Atl. City, 152 N.J. 532, 554 (1998) (quoting In re Emmons, 63 N.J. Super. 136, 140 (App. Div. 1960) (holding that conduct unbecoming a police officer involves conduct that "has a tendency to destroy public respect for municipal employees and confidence in the operation of municipal services")). Furthermore, "police officers are different from other public employees," City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 572 (1998), and thus they "are held to higher standards of conduct than other public employees[,]" In re Attorney General Law Enforcement Directive Nos. 2020-5 and 2020-6, 465 N.J. Super. 111, 147 (App. Div. 2020) (citing In re Disciplinary Procedures of Phillips, 117 N.J. 567, 577 (1990)). Considering our deferential review of the Commission's decisions, Ruiz has not shown to us that his termination was shocking based upon his offenses.

Ruiz's contention that the City never issued a PNDA with respect to alleged violations of department rules and regulations or to the criminal charges in June 2016 is similarly without merit. We disagree with the City that because the two separate indictments took over three years to resolve, it acted correctly

in amending the FNDA and not issuing an additional PNDA against the previously terminated Ruiz. Nevertheless, the procedural shortcoming was inconsequential and did not prejudice Ruiz, as it was redressed through the contested hearing before the ALJ. See Ensslin v. Twp. of N. Bergen, 275 N.J. Super. 352, 361 (App. Div. 1994) ("[p]rocedural irregularities at the departmental level are considered 'cured' by a subsequent plenary hearing at the agency level."). Ruiz was well aware of the charges and the evidence that was going to be used against him at the hearing because the same proofs were used at his criminal trials. He thus had ample time to examine and evaluate the evidence prior to the hearing before the ALJ. Moreover, Ruiz had the opportunity to cross-examine the City's witnesses and present his own witnesses. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). (noting that the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'"). Thus, any lack of process was cured by the hearings before the ALJ.

### III.

Finally, we address Ruiz contention that under N.J.A.C. 4A:2-2.7(a)(2), he is entitled to back pay from the date he was acquitted of all the criminal

charges against him—July 19, 2018—until the date of the ALJ's decision on May 22, 2019. The City contends that because Ruiz was terminated, it could not, and should not, have reversed its FNDA due to the fact he blatantly and openly used taxpayer money for his own benefit. Because the issue of back-pay entitlement was not determined by the Commission, we remand for it to decide that issue in the first instance.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION