802 A.2d 569

TOWNSHIP OF TEANECK, PLAINTIFF–APPELLANT/CROSS–RE-SPONDENT, v. TEANECK FIREMEN'S MUTUAL BENEVO-LENT ASSOCIATION LOCAL NO. 42, DEFENDANT–RESPON-DENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 30, 2002—Decided July 16, 2002.

Before Judges STERN, COLLESTER and PARKER.

*Jeffrey M. Daitz* argued the cause for appellant/ cross-respondent (*Peckar & Abramson*, attorneys; *Mr. Daitz*, on the brief).

*David I. Fox* argued the cause for respondent/ cross-appellant Teaneck Firemen's Mutual Benevolent Association (*Fox & Fox*, attorneys; *Deborah A. Young*, on the brief).

Susan E. Galante, Deputy General Counsel, argued the cause for Public Employment Relations Commission (Robert E. Anderson, attorney; Ms. Galante, on the brief).

The opinion of the court was delivered by

COLLESTER, J.A.D.

The Township of Teaneck appeals from an order of the Public Employment Relations Commission (PERC) entered on October 28, 1999, affirming a public interest arbitration award settling an impasse in collective bargaining negotiations between Teaneck and the Teaneck Firemans Mutual Benevolent Association Local 42 (FMBA), which represents Teaneck's sixty-eight rank and file firefighters. The FMBA cross-appeals from that portion of the order modifying the arbitration award. We affirm in part and reverse in part.

The collective bargaining agreement between the parties had expired on December 31, 1996, and attempts to negotiate a successor agreement failed. FMBA declared an impasse in negotiations and filed a petition with PERC on January 2, 1997, to initiate compulsory interest arbitration pursuant to the Police and Fire Public Interest Arbitration Reform Act (the Reform Act), *N.J.S.A.* 34:13A–14a to –16.6.

PERC provided a list of arbitrators from its special panel, and the parties mutually agreed on Carl Kurtzman. Accordingly, Timothy Hundley, PERC's acting arbitration director, appointed Kurtzman in February 1997. After unsuccessful attempts to mediate the dispute, Kurtzman asked to be relieved of the assignment on grounds that the FMBA had requested his withdrawal.

Over Teaneck's objection, Hundley accepted Kurtzman's resignation. Since the parties could not agree on a new arbitrator, Hundley appointed James Begin from PERC's special panel.

After conducting hearings on diverse dates between June and October 1998, Begin issued a decision on March 15, 1999:(1) awarding salary increases within the percentages requested by the parties; (2) granting a two percent stipend for firefighters with emergency medical training (EMT) certifications; and (3) adopting on a trial basis a new shift schedule for FMBA firefighters of a twenty-four hour shift, followed by seventy-two hours off duty, known as a "24/72."

Teaneck filed a notice of appeal to PERC in March 1999. After hearing oral argument, PERC issued its decision on October 29, 1999, affirming the arbitrator's award but modifying the implementation of the 24/72 schedule pending either agreement for the parties or the adoption of the 24/72 schedule for the fire officers' unit. Teaneck appealed from PERC's decision [1], and the FMBA filed a notice of cross-appeal as to PERC's modification of the arbitrator's order implementing the 24/72 work schedule.

By far the most contentious issue before the arbitrator was the FMBA's proposed change in shift schedule to a 24/72. The Teaneck firefighters worked two ten hour days followed by twenty-four hours off, then two fourteen hour nights, followed by seventy-two hours off, which is known as a "10/14" schedule. Under either shift schedule the firefighters work forty-eight hours in an eight day tour. Testifying for the FMBA, Paul Chrystal, a member of the Union Township Fire Department and battalion chief, said that the 10/14 shift was in effect in Union from 1960 to 1979 when the change was made to the 24/72 shift. He participated in an evaluation of the change prepared by both the officers' and rank-and-files' local unions of the last six years of the 10/14

---

[1] Teaneck has since implemented the salary increases and modifications of the contractual agreements procedure as determined by the arbitrator and does not raise these issues on appeal.

shift (1974–1979) and the first six years of the 24/72 shift (1980–1986). Chrystal testified there was a ninety-five percent increase in services provided (classified alarms, inspections and non-emergency aid) as a result of the change to the 24/72 shift, a twenty-three percent decrease in firefighting injuries, a thirty-five percent decrease in sick leave, a fifty-eight percent decrease in overtime and a thirty-eight percent decrease in civilian injuries.

Chrystal attributed each of the improvements to the adoption of the 24/72 schedule. He claimed the decrease in firefighter injuries was due to the increase in recuperative time to seventy-two hours; the decrease in civilian injuries because of an increase in fire prevention activities; and the decrease in overtime as a result of the diminished number of injuries and sick leave. He explained that the more recuperative time for firefighters translated to less sick time and fewer injuries because seventy-two hours was "an optimal recuperation time for a firefighter's body to eliminate toxins" from inhaling gases, which posed the greatest risk to firefighters. He added that the new schedule raised morale with more sustained quality time off. It also gave more opportunity for firefighter training because firefighters working weekend days on the 10/14 shift would go eight days before the weekday training division could work with them while only four days would elapse on the 24/72 shift. Chrystal testified further that in both New Jersey and throughout the United States there was a significant trend toward adoption of the 24/72 shift for firefighters and that the International Association of Firefighters approved the 24/72 shift because it resulted in fewer firefighter fatalities.

Supporting Chrystal's testimony was William Lavin, president of the New Jersey FMBA and the Elizabeth Local, who testified that when Elizabeth changed from the 10/14 shift to the 24/72 shift in 1976, there was a 3800 man-hour reduction in sick leave in the first year. He added that the new schedule resulted in an improvement in production, service, training and motivation. Moreover, the City of New Brunswick accepted the change to the

24/72 shift because it was "better for the health of the firefighters."

Testifying for Teaneck in opposition to the change to the 24/72 shift was William Norton, Teaneck's Fire Chief. He opposed the switch on grounds that it would impede proper supervision. He claimed the new schedule would require another deputy chief and staff officer to maintain the department's day-to-day operations.[2] Most significant was his testimony that the continuity of supervision would suffer from the change for the rank-and-file to a 24/72 while the officers were on the 10/14 schedule.

Prior negotiations with the officers unit, Local 242, culminated in interest arbitration under the Reform Act, and one of the issues involved a proposal by the officers for a change to a 24/72 shift. Teaneck opposed, and the arbitrator rejected the shift change. *In the Matter of Tp. of Teaneck and Prof'l Officers Ass'n* (PERC Docket No. IA–97–58, Sept. 4, 1998). The subsequently negotiated agreement with the Teaneck officers continued the 10/14 shift and expires in 2004.

Gary Saage, Teaneck's municipal manager, testified that it would be "chaotic" to have officers and rank-and-file firefighters on different schedules. Notably, the officers and rank-and-file in both Union and Elizabeth adopted the 24/72 schedule at the same time. Nonetheless, Chrystal opined that effective supervision could occur with the two groups on different schedules.

Chief Norton further testified that he understood from other fire chiefs that firefighters on the 24/72 shift moved farther away from their municipalities, which made it more difficult to recall them. However, Lavin disputed this claim, stating that the change to the 24/72 did not result in more firefighters moving out of town in either Elizabeth or Union. While Chief Norton acknowledged the possibility of improvement in morale and less use of sick leave and overtime with the 24/72 shift, he was fearful that

---

[2] The FMBA represents that "since the time of the Chief's testimony, an additional Deputy Chief position has been filled by the Township."

the firefighters might use less sick time during a trial period and then return to increased sick leave, which he claimed was already "out of control."

Regarding the proposed EMT stipend, Chief Norton and Richard Silvia, a Teaneck captain, explained that firefighters render first aid at accident and fire scenes until the ambulance corps or paramedics from a hospital arrive. They stated there had been a substantial increase in medical calls. Seven rank-and-file Teaneck firefighters had obtained EMT certifications and were seeking an EMT stipend. According to an exhibit produced by the FMBA, nine other fire departments in the area awarded EMT stipends ranging in amounts from $1,250 to $3,471. Municipal manager Saage testified that Teaneck encouraged firefighters to take the EMT training and paid for them to maintain their certification. However, he said that as a matter of policy, the Township did not pay stipends for certifications.

Both sides presented testimony on Teaneck's ability to fund the FMBA's economic proposals. Raphael Caprio, the FMBA's expert in municipal budgets, reviewed Teaneck's budgets and financial data and concluded that Teaneck was financially sound and able to fund the FMBA's proposal. Saage countered Caprio's analysis and stated that he anticipated a budget deficit in 1998.

After receiving and considering the evidence and testimony, the arbitrator ruled in favor of both the 24/72 shift schedule and a stipend for EMT firefighters. He relied on the prevalence of the 24/72 schedule in other communities, the findings of Union's twelve year study, the favorable results from the schedule change in Elizabeth, and Chrystal's testimony that the officers and rank-and-file could work effectively on different schedules. He rejected Chief Norton's objections as speculative and noted that Teaneck offered no direct evidence from the New Jersey communities with the 24/72 schedule to indicate any substance to the concerns expressed by the Chief. He found that "the substantial benefits of the 24/72 schedule to all parties, the Town, the firefighters, and the public, justifies undertaking a trial run." He added that the

24/72 schedule should not continue beyond a trial period unless both parties, or an arbitrator if they could not agree, were convinced that the new schedule achieved the "objectives of (1) improving moral, (2) reducing sick leave, (3) reducing overtime, (4) enhancing training, (5) maintaining or improving productivity using the same number of firefighters and work hours, and (6) reducing firefighter and civilian injuries." He recommended the parties appoint a joint committee to evaluate the impact of the new schedule and that Teaneck consider implementing the same schedule for its fire officers.

With respect to the EMT stipend, the arbitrator found three compelling reasons for awarding a two percent stipend for EMT certification: (1) the "demonstrable increase in the first medical response workload"; (2) the award of EMT certification stipends in other communities in amounts higher than the two percent awarded here; and (3) as a "quid pro quo" for a change in dates of salary increases.

Teaneck appealed the arbitrator's decision and award to PERC in March 1999. PERC approved the arbitrator's findings on the desirability of the 24/72 schedule based on the FMBA's largely undisputed evidence, but it determined that the arbitrator should have given more weight to the consequences of different work schedules for the rank-and-file and the officers. Finding that supervision would be impaired with the two units on different schedules, PERC delayed implementation of the new schedule until it could be employed for both units.

PERC also found that the evidence supported the arbitrator's award of the stipend for EMT certification. PERC reasoned that because Teaneck encouraged firefighters to obtain EMT certification, "the arbitrator reasonably concluded that it was appropriate, as part of an overall economic package, to compensate those unit members who obtained training that their employer believed was useful, although not required, for their position."

Teaneck appeals from both the award of an EMT stipend and the approval of a 24/72 work schedule, claiming that the issues

were non-negotiable management prerogatives. It also asserts that the removal of Kurtzman as arbitrator was without good cause, violated the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –30, and was arbitrary and capricious.

With respect to recusal by Kurtzman, PERC asserts that when an interest arbitrator acts as a mediator and mediation is unsuccessful, most interest arbitrators will withdraw from a case if one party so requests. Therefore, PERC contends its decision to allow Kurtzman's withdrawal was consistent with interest arbitration practice. Furthermore, PERC emphasized that Kurtzman resigned and was not removed.

Kurtzman's resignation was obviously with reluctance. He wrote to PERC's acting arbitration director explaining that he had conducted five mediation sessions with the parties and submitted two mediation recommendations. He related that the FMBA failed to ratify his second recommendation and requested that he resign while Teaneck objected to his withdrawal. Kurtzman noted that this was the first time in twenty-six years as an arbitrator for PERC that a party had asked him to withdraw. He added that he felt confident he could conduct the arbitration hearing and issue an award consistent with the statutory criteria without reference to the prior settlement discussions and feared that honoring the request for withdrawal "could inhibit aggressive mediation efforts by arbitrators." On the other hand, he was concerned that litigation over the arbitrator would substantially delay resolution of the impasse and therefore asked to be relieved "so that the impasse may be expeditiously resolved."

We find no basis in Teaneck's claim of error with regard to the replacement of Kurtzman as arbitrator. The record substantiates that PERC did not remove Kurtzman; it approved his withdrawal. Teaneck has failed to show how this action honoring Kurtzman's request was in any way arbitrary or capricious. PERC's decision is entitled to deference. *See N.J.A.C.* 19:16–5.6(d) and (e). We find no error in its actions. Cf. *Aberdeen v. PBA Local 163*, 286 *N.J.Super.* 372, 669 *A.*2d 291 (App.Div.1996).

Teaneck contends that PERC erred in affirming the shift change to a 24/72 and in ordering EMT stipends on grounds that these were issues of managerial prerogative and not negotiable or arbitrable. It argues that the schedule change would interfere with its governmental policy interest in maintaining stability, continuity, supervision and efficient operation of the fire department. It further maintains that the award of EMT stipends would impede its authority to address staffing levels and determine whether EMT services should be maintained.

██ It is undisputed that Teaneck did not file a scope-of-negotiations petition with PERC stating that negotiations were not appropriate on either the shift change or the EMT stipend. Absent a pre-arbitration scope petition asserting that negotiations are not permitted on a subject, the parties are deemed to have agreed to arbitrate all unresolved issues. *N.J.A.C.* 19:16–5.5(b) and (c). A party cannot go through the negotiations process and then argue it was not required to engage in that process because the subject was not mandatorily negotiable. The PERC regulations specifically provide that when a party contends that an unresolved issue is not within the required scope of negotiations, and the other party disagrees, the party seeking to exclude the issue from negotiations "shall file with [PERC] a petition for scope of negotiations determination." *N.J.A.C.* 19:16–5.5(c). The regulation continues:

> This petition must be filed within 14 days of receipt of the notice of filing of the petition requesting the initiation of compulsory interest arbitration. The failure of a party to file a petition for scope of negotiations determination shall be deemed to constitute an agreement to submit all unresolved issues to compulsory interest arbitration.
>
> [*Ibid.*]

In this instance Teaneck did not raise the issue of the arbitrability of the EMT stipend by filing a scope-of-negotiations petition before PERC and therefore cannot now argue that the issue was not a negotiable one. PERC's decision on the scope-of-negotiations will stand unless it is clearly demonstrated to be arbitrary and capricious under *N.J.S.A.* 34:13A–16(g). *See City of Jersey*

*City v. Jersey City PBA,* 154 *N.J.* 555, 568, 713 *A.*2d 472 (1998); *Matter of Hunterdon County Board of Chosen Freeholders,* 116 *N.J.* 322, 329, 561 *A.*2d 597 (1989). Therefore, Teaneck is estopped from arguing the issue of negotiability of the EMT stipend.[3]

Therefore, we limit consideration of Teaneck's arguments to the issue of whether sufficient evidence supported PERC's determination with regard to the criteria set forth in *N.J.S.A.* 34:13A–16(g).

The arbitrator awarded the EMT stipend in part because he found that it was in the public interest for firefighters to have EMT training. He also noted the increase in medical response workload in Teaneck and the number of other municipalities in the area granting such stipends. He estimated the eight firefighters with EMT training would cost Teaneck $8,448 in 1999 for the two percent stipend. PERC affirmed the arbitrator. While recognizing a governmental policy issue arises as to whether a fire department is authorized to provide EMT services, the issue was not raised in the instant case since the fire department in Teaneck provided EMT training over a period of a year.

 Our scope of review of PERC decisions reviewing arbitration is sensitive, circumspect and circumscribed. *Hunterdon, supra,* 116 *N.J.* at 328, 561 *A.*2d 597. PERC's decision will stand unless clearly arbitrary or capricious. *Matter of Bridgewater Tp.,* 95 *N.J.* 235, 244–45, 471 *A.*2d 1 (1984). We find no basis to overturn the determination by PERC affirming the award of the EMT stipend.

The issue as to Teaneck's failure to file a scope of negotiations petition respecting the proposed 24/72 shift change comes from a different procedural posture. The 24/72 work schedule was listed in FMBA's January 1997 petition. While not filing a scope of

---

[3] We further note that the Supreme Court has held that additional compensation for education or training that is not a job requirement is a mandatorily negotiable subject. *Board of Ed. of City of Englewood v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 5–6, 8, 311 *A.*2d 729 (1973).

negotiations petition, the Township participated in the five hearing dates with considerable testimony concerning the work schedule. While Teaneck raised its negotiability arguments before the arbitrator, he had no authority to rule on it. *N.J.S.A.* 34:13A–5.4d; *N.J.A.C.* 19:16–5.7(h).

The situation here is analogous to that in *In the Matter of Tp. of Delran and Delran Twp. SOA*, 25 *NJPER* 166 (¶ 30076 1999), in which the Township challenged the arbitrability of a proposal, first before the arbitrator who rejected the argument, and then on appeal before PERC. PERC said:

> This type of threshold challenge to the arbitrator's jurisdiction and the legal arbitrability of a proposal, like a more typical scope of negotiations challenge, can affect the issues that will be considered in a proceeding and, therefore, should be made and decided before the arbitrator's final opinion and award. See *N.J.A.C.* 19:16–5.5(c).... Further, this type of challenge to the legal arbitrability of an interest arbitration proposal should be decided in the first instance by us, not the arbitrator ...
>
> For these reasons, we hold that challenges to an arbitrator's jurisdiction or the legal arbitrability of a proposal, should, in the future, be made in the time and manner prescribed by *N.J.A.C.* 19:16–5.5(c).
>
> [*Delran, supra*, 25 *NJPER* at 168.]

Both PERC and the FMBA argue that Teaneck should be estopped by virtue of its failure to assert a scope of negotiations petition, from contending that the work schedule was not negotiable since it would undermine the authority of the arbitrator and the arbitration system under PERC. However, unlike the issue of the EMT stipend the claim on non-negotiability was made by Teaneck before the arbitrator and, subsequently, before PERC. Moreover, PERC considered and decided the issue of negotiability after the arbitration hearing in the course of considering whether the evidence adduced at arbitration supported the award. *N.J.S.A.* 34:13A–5.4d give PERC "the power and duty, upon the request of any public employer ... to make a determination as to whether a matter in dispute is within the scope of collective negotiations."

We interpret *N.J.A.C.* 19:16–5.5(c) in light of *N.J.S.A.* 34:13A–5.4d to permit PERC to consider late challenges to a

proposal's negotiability. The "agreement to submit all unresolved issues to compulsory interest arbitration," established in *N.J.A.C.* 19:16–5.5(c) when a party fails to file a scope-of-negotiations petition, need not preclude a challenge to negotiability made after the arbitration when PERC decides to consider the issue. *See Jersey City, supra,* 154 *N.J.* at 567, 713 *A.*2d 472.

Under *N.J.S.A.* 34:13A–5.3, public employers and employees are authorized to negotiate "terms and conditions of employment." In the public sector, however, because the employer is government, the responsibility is to make and implement public policy through the political process, as opposed to negotiation and arbitration. The Supreme Court clarified the important distinction in *Local 195, IFPTE, AFL–CIO v. State,* 88 *N.J.* 393, 443 *A.*2d 187 (1982).

[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy.

[*Id.* at 404–05, 443 A.2d 187.]

In making this last determination, the Court stated:

it is necessary to balance the interest of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

[*Id.* at 405, 443 A.2d 187.]

Applying this standard, the court in *Local 195* held that a proposal to make a normal workweek consist of five consecutive workdays, where practicable, was negotiable. *Id.* at 411–12, 443 A.2d 187. The Court reasoned: "The contract provision in this case concerns the negotiable subject of individual work schedules rather than the formation of an overall calendar." *Id.* at 412, 443 A.2d 187. In *Jersey City, supra,* 154 *N.J.* at 574–75, 713 *A.*2d 472, the Court reaffirmed that the question of negotiability must be determined on a case-by-case basis.

■ In the instant case, the issue is whether the suggested change of shift schedule would interfere with Teaneck's manageri-

al prerogative to determine public policy. Teaneck relies on *Bor. of Atl. Highlands v. Atl. Highlands PBA Local 242,* 192 *N.J.Super.* 71, 469 *A.*2d 80 (App.Div.1983), *certif. denied,* 96 *N.J.* 293 (1984). There, the PBA proposed a work schedule that added a day off every three weeks, which the Borough alleged would create gaps in necessary coverage and reduce the department's efficiency. *Id.* at 74–75, 469 A.2d 80. We underscored the small size of the Borough and its police force, in concluding that "the fixing of the overall work schedule" was not negotiable because negotiation "would significantly interfere with the exercise of the inherent managerial prerogatives necessary to the proper operation of a police force." *Id.* at 77, 469 A.2d 80. In the instant case, the size of the force does not present the same issues. Moreover, the FMBA proposal does not reduce the firefighters' work time since under both the old and proposed shift schedules, they would work forty-eight hours every eight days.

Teaneck further relies on *Irvington PBA Local No. 29 v. Town of Irvington,* 170 *N.J.Super.* 539, 545–56, 407 *A.*2d 377 (App.Div. 1979), *certif. denied,* 82 *N.J.* 296, 412 A.2d 801 (1980), in which we held that a police officers' schedule change, from fixed to rotating shifts, was not negotiable because "the change was basic to the direction and functioning of the police department and that the requirement of mandatory negotiation impeded the police chief in his efforts to increase efficiency and to enforce discipline." *Id.* at 545, 407 A.2d 377. No such issue of discipline and efficiency is presented under the proofs at bar.

In *Matter of Mt. Laurel Tp.,* 215 *N.J.Super.* 108, 114, 521 *A.*2d 369 (App.Div.1987), we refused to interpret *Atlantic Highlands* and *Irvington* "as establishing a *per se* rule of exclusion for police scheduling issues" and declared that each case must be determined individually under the balancing test set forth in *Local 195, supra,* 88 *N.J.* at 401–05, 443 *A.*2d 187. We also noted the comment in *Local 195* that "rates of pay and working hours" were "prime examples of subjects" that were negotiable. *Id.* at 403, 443 A.2d 187.

Our holding in *Mt. Laurel* was that the union's proposal to reduce to writing a work schedule already in effect was negotiable. We emphasized that the Township submitted no facts in support of its position and failed to meet its burden "to advance reasons in support of its need, from a policy making point of view, to unilaterally control police work hours." *Mt. Laurel, supra,* 215 *N.J.Super.* at 115, 521 *A.*2d 369. Moreover, unlike *Highlands* and *Irvington,* the assertions by the public employer that the proposed changes would impact efficiency and discipline were challenged. *Id.* at 114, 521 A.2d 369.

PERC has also considered issues of police and fire scheduling to be a proper subject for mandatory negotiation. In *In re Tp. of Maplewood and Maplewood FMBA Local No. 25,* 23 *NJPER* 106, 113–14 (¶ 28054 1997), PERC held that the FMBA's proposal to change from the 14/10 to the 24/72 shift was negotiable. While avoiding the merits of the shift change, the Commission concluded that the employer's concerns were "not so compelling and so incontrovertible as to warrant cutting off negotiations and the interest arbitration process altogether." *Id.* at 114, 521 A.2d 369. The decision is silent as to whether the superior officers were on the same 24/72 schedule as the other firefighters.

PERC has held that a shift change is not negotiable when it would result in different shifts for supervisors and rank-and-file. In *In the Matter of City of Newark and Prf'l Fire Officers' Ass'n, Local 1860,* 14 *NJPER* 248 (¶ 19092 1988), the officers proposed to change to the 24/72 shift while the firefighters remained on the 14/10. PERC determined that the superior officers would not be able to supervise firefighters effectively, and the proposal was therefore not negotiable. *Id.* at 249–50. Similarly, in *In re Bor. of Closter and PBA Local 233,* 11 *NJPER* 132 (¶ 16059 1985), the Borough required patrol officers to begin and end their shifts three hours earlier, so that their shifts would conform to those of the superior officers. PERC held that the change was not negotiable because it was "necessary for effective supervision and to enable the force to function effectively as a unit." *Id.* at 135.

We determine that Teaneck's need for effective supervision should not preclude negotiability of a change to a 24/72 shift for firefighters. *Mt. Laurel* rejected a *per se* rule for exclusion of police work schedules from the scope of negotiations, and work hours are a negotiable term and condition of employment for both police officers and firefighters under *N.J.S.A.* 34:13A–16g(2) and (8). Therefore, the question is whether the proposed work schedule would so impede governmental policy to foreclose the issue for arbitration. *Local 195, supra,* 88 *N.J.* at 401–02, 443 *A.2d* 187. We hold that the issue is negotiable in the instant case. Special circumstances such as presented in *Atlantic Highlands* and *Irvington* are absent. The arbitrator could consider the arguments pro and con with respect to a proposed work schedule for firefighters which is common throughout the State and whether the claim of increase in personal safety of firefighters and safety of the public outweighs the municipal concerns of efficiency and supervision under the balancing test of *Local 195.*

Teaneck argues that the fact that the fire officers' contract which maintains the 10/14 schedule forecloses the issue of a 24/72 work schedule for the rank-and-file from mandatory negotiations because of the "chaos" which would result from the firefighting units working on different schedules. However, it is within the power of Teaneck to negotiate the 24/72 schedule for both units if it chooses to do so. The record does not indicate that the officers sought the 24/72 shift and received an adverse determination in interest arbitration under the Reform Act. Under *N.J.S.A.* 34:13A–5.3 a modification of the officers' contract governing workday conditions could be re-negotiated if Teaneck desired.

We conclude, therefore, that PERC was correct in determining that the issue of work schedules for rank-and-file firefighters was not foreclosed as a managerial prerogative and was subject to mandatory negotiations or interest arbitration.

We now turn to the issue on cross-appeal by the FMBA from PERC's modification of the decision of the arbitrator so as to delay the implementation of the 24/72 shift until the same schedule

was adopted for both officers and rank-and-file firefighters.[4] The FMBA contends that PERC exceeded its scope of review and improperly substituted its judgment for that of the arbitrator by modifying the arbitrator's fact findings which were based on substantial credible evidence in the record. The FMBA also argues that PERC's modification of the award constitutes an illegal parity clause and improperly links supervisory and non-supervisory units.

PERC counters that it did not modify the arbitrator's fact findings but instead established guidelines for implementation of work schedule changes. It also asserts that it was justified in linking the schedule change between the officers' and line firefighters' units because it would impair supervision to have the two units work a different schedule. Teaneck does not address this issue.

The Reform Act authorizes PERC to decide appeals of interest arbitration awards. It may "affirm, modify, correct or vacate the award or may, at its discretion, remand the award to the same arbitrator." *N.J.S.A.* 34:13A–16f(5)(a). Absent violation of standards of conduct, PERC's appellate role is to determine whether the arbitrator considered the criteria in *N.J.S.A.* 34:13A–16(g) governing the issuance of an interest arbitration award and rendered a reasonable determination of the issue or issues at impasse that was supported by substantial evidence in the record. *Hillsdale PBA Local 207 v. Bor. of Hillsdale*, 137 *N.J.* 71, 82, 644 *A.*2d 564 (1994); *In the Matter of Cherry Hill Tp. and FOP Lodge 28*, 23 *NJPER* 287 (¶ 28131 1997); *In the Matter of Bor. of Bogata and PBA, Local 86*, 24 *NJPER* 454 (¶ 29210 1998); *In the Matter of Borough of Allendale and PBA Local No. 217*, 24 *NJPER* 216 (¶ 29103 1998).

In reviewing Begin's decision PERC upheld his statutory findings as well as his evidential findings of the substantial benefits

---

4 We are advised that the contract with the fire officers expires in 2004.

for adoption of the 24/72 schedule on a trial basis. However, it modified the arbitrator's award based on its concern as to whether supervision would be impaired with the rank-and-file firefighters in a different schedule from the superior officers. By its decision PERC provided direction to interest arbitrators to conduct a factual analysis on the question of supervisory impairment where the work schedule proposal results in differing work schedules for firefighters.

PERC noted that its only decisions dealing with a similar change of schedule proposal resulting in different shifts for supervisors and rank-and-file were scope of negotiations decisions where the merits of the proposals were not discussed. *See Maplewood, supra,* 23 *NJPER* at 110–14; *Bor. of Closter, supra,* 14 *NJPER* at 135. It refused to adopt Teaneck's position that the resulting different shifts rendered the FMBA's proposal non-negotiable, stating "we do not hold that a proposal that would result in different work schedules for superior officers and rank-and-file is not mandatorily negotiable as a matter of law." However, it added the following standard for arbitrators in such cases:

> [A]n arbitrator may award such a proposal only if he or she finds that the different work schedules will not impair supervision or that, based on all the circumstances, there are compelling reasons to grant the proposal that outweigh any supervision concerns.

PERC acknowledged that the arbitrator properly placed the burden on the FMBA to justify its proposal, but then stated

> However, [the arbitrator] did not have the benefit of this opinion clarifying the relationship between our scope-of-negotiations case law and the interest arbitration process, and we find more weight should have been given to the fact that the proposal would result in different work schedules for the two units. At the same time, the FMBA offered undisputed evidence as to the potential benefits of the 24/72 schedule. Absent the supervision issue, we would find that the arbitrator's decision to award the proposal on a trial basis was a reasonable determination of the issues, *N.J.S.A.* 34:13A–16g, that was supported by substantial credible evidence in the record as a whole.

Rather than remand the matter back to the arbitrator for reevaluation in light of its new guideline, PERC stated:

In this posture we will exercise our authority under *N.J.S.A.* 34:13A–16f(5)(a) and modify the award to provide that the 24/72 work schedule shall be implemented only if and when the 24/72 schedule is adopted for the superior officers' unit.

The upshot of PERC's application of its new standard by modifying the arbitrator's award rather than remanding it for reconsideration is that although the FMBA proposal was found to provide greater health and safety benefits, it is held captive to the results of future negotiations between the Township and the much smaller unit of superior officers who apparently favor the 24/72 schedule but whose other concerns and priorities may differ from the rank-and-file.

By tying the rank-and-file to the superior officers, the PERC decision entwines the future collective bargaining of each unit. When Teaneck considers the proposal of the fire officers to change to the 24/72 shift, if the officers make such a proposal in 2004, Teaneck will inevitably consider that if it agrees, it must also grant the shift change to the FMBA. The FMBA will thus have an impact on the negotiations between Teaneck and the officers. Further, the officers will have an impact on future negotiations between Teaneck and the FMBA, because any FMBA proposal to change to the 24/72 shift will depend on the officers' obtaining this same benefit.

From a practical standpoint PERC's decision dooms the FMBA rank-and-file to continuation on the 10/14 shift in perpetuity so long as the Township continues to oppose the change to a 24/72 shift for the officers, even though the FMBA proved in contested hearings before the arbitrator that the 24/72 schedule is superior in several ways including increased safety and health benefits for firefighters as well as greater safety to the general public. By its postponement of a trial period for the 24/72 schedule, PERC has sent FMBA's proposal off to a political never-never land. Such a result is both arbitrary and unreasonable.

■ We also find that PERC departed from its proper scope of review of an arbitration decision under the Reform Act. In

*Cherry Hill, supra,* 28 *NJPER* at 289 the Commission described its role on review of an interest arbitration award as follows:

[T]he reform statute vests the arbitrator with the responsibility to weigh the evidence and fashion an award. We will not disturb the arbitrator's exercise of discretion in weighing the evidence unless an appellant demonstrates that the arbitrator did not adhere to the standards in the reform statute or the Arbitration Act or shows that the award is not supported by substantial credible evidence in the record as a whole.

PERC's decision *sub judice* recognizes that the arbitrator considered the statutory criteria of *N.J.S.A.* 34:13A–16g and finds substantial evidence in support of his findings as the superior benefits of the 24/72 shift. However, it adds that "more weight should have been given to the fact that the proposal would result in different work schedules for the two units."

In fact, a review of the arbitrator's decision indicates that the different work schedules was given significant consideration by the arbitrator. He gave attention to the testimony of Chief Norton about potential supervisory problems and noted that the Chief indicated that the 24/72 schedule was manageable with additional staff. In determining that the benefits of the 24/72 schedule were worthy of a trial basis, the arbitrator was clearly mindful of supervisory concerns. The comment of PERC that "more weight" should have been given to the consequences of different work schedules for the two units is comprehensible only as a *sub silentio* finding by PERC that supervision would be impaired, which was in contrast to the finding by the arbitrator that the two schedules could not be "unworkable."

In its argument on appeal PERC argues that it did not engage in fact finding. It contends that the arbitrator's decision indicated "in effect a finding that supervision would be impaired by different schedules" so that there was a basis to modify the award rather than remand the matter to the arbitrator. But what the arbitrator said was quite different. He found as follows:

Although the record indicates that different schedules for the Fire Officers and the Firefighters would not be unworkable, the Arbitrator believes that supervisory efficiency and teamwork would be best served if the Fire Officers and Firefighters worked the same schedule, **and he recommends that the parties responsible for**

**that decision consider implementing a common schedule.** (Emphasis in original.)

We find no error in PERC establishing its new guideline or standard in care of this nature. However, we find that by modifying the arbitrator's award in this fashion rather than remanding to the arbitrator, PERC exceeded the scope of its review, improperly foreclosed the arbitrator from applying its new guideline to his factual findings, and effectively deprived the FMBA from consideration of the 24/72 schedule on the trial basis awarded by the arbitrator.

We reverse PERC's order and remand to the Commission to succinctly articulate its new guideline regarding impairment of supervision and to remand to the same arbitrator for evaluation of proofs and factual findings in light of PERC's standard. The arbitrator may consider receipt of additional testimony or other evidence if he deems it necessary or appropriate. We do not retain jurisdiction.

Affirmed in part. Reversed and remanded in part.