37 A.3d 1162

TOWNSHIP OF FRANKLIN, APPELLANT, v. FRANKLIN TOWNSHIP PBA LOCAL 154, RESPONDENT.

TOWNSHIP OF FRANKLIN, APPELLANT, v. FRANKLIN TOWNSHIP PBA LOCAL 154 SUPERVISORY OFFICERS ASSOCIATION, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted October 26, 2011—Decided March 8, 2012.

Before Judges CUFF, LIHOTZ and ST. JOHN.

*DeCotiis, Fitzpatrick & Cole, LLP,* attorneys for appellant (*Louis N. Rainone,* of counsel and on the briefs; *Avis Bishop–Thompson,* on the briefs).

*Klatsky, Sciarrabone & DeFillippo,* attorneys for respondents (*David J. DeFillippo,* of counsel and on the brief).

*Martin Pachman,* General Counsel, attorney for respondent New Jersey Public Employment Relations Commission (*Don Horowitz,* Deputy General Counsel, on the statement in lieu of brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

In these two matters, calendared back-to-back and consolidated for purposes of this opinion because they present identical issues for review, appellant the Township of Franklin (the Township) appeals from two separate Public Employment Relations Commission (PERC) decisions denying its scope of negotiation petition, seeking a determination that proposed work schedule modifications were non-negotiable. The Township maintained its managerial authority to implement new schedules was authorized by a provision contained in the collective negotiations agreements (CNA)[1] with respondents, the Franklin Township PBA Local

---

[1] Generally, "[i]n public sector labor relations in New Jersey, courts use the terms 'collective negotiation' and 'collective negotiations agreements' rather than 'collective bargaining' and 'collective bargaining agreements[,]' " *Troy v. Rutgers,* 168 *N.J.* 354, 359 n. 1, 774 *A.2d* 476 (2001) (citing *N.J. Tpk. Emps. Union v. N.J. Tpk. Auth.,* 64 *N.J.* 579, 581, 319 *A.2d* 224 (1974)), a term found in

# 154(PBA) and the Franklin Township PBA Local # 154 Supervisory Officers Association (SOA), the collective bargaining organizations for certain police officers employed by the Township.[2] PERC rejected the Township's position and ordered the issues must be arbitrated. Following our review of the arguments advanced, in light of the record and applicable law, we affirm both PERC orders.

The Township, a public employer as defined by *N.J.S.A.* 34:13A–3,[3] of the New Jersey Employer–Employee Relations Act (Act), *N.J.S.A.* 34:13A–1 to –30, entered into independent CNAs with the PBA and SOA, governing the terms of employment of all member police officers employed by the Township. The CNAs at issue were effective from January 1, 2008 to December 31, 2009, and contained clauses addressing management's right to change work schedules. Pending a successor agreement, the terms of the 2008–2009 CNAs remain in full force and effect.

The provisions found in Article 6C of the PBA's CNA stated, in pertinent part:

> It is understood that at the present time and at the time of this agreement, most members of the PBA are working a four (4) day on, four (4) day off shift. It is understood that the rate of overtime compensation becomes effective at an hourly threshold lower than that called for in the Fair Labor Standards Act. The 4 & 4 shift is for example purposes only and it is understood that management reserves the right to change shifts as needed.

But for the omission of the first four words and the reference to the bargaining unit, the terms of Article 7C of the CNA between the Township and the SOA was identical. Similar clauses had

the federal Labor Management Relations Act, 29 *U.S.C.A.* § 141 et seq. In our opinion, we follow this nomenclature notwithstanding the parties' reference to their agreement as a "collective bargaining agreement."

2 The PBA is the bargaining agent for all police officers below the rank of sergeant, and the SOA is the bargaining agent for all sergeants and lieutenants.

3 *N.J.S.A.* 34:13A–3(c) defines "public employers" as "the State of New Jersey, or the several counties and municipalities thereof, or any other political subdivision of the State, or a school district, or any special district, or any authority, commission, or board, or any branch or agency of the public service."

been embodied within the terms of the expired 2004–2007 PBA and SOA CNAs.

In an effort to streamline operations while maintaining service levels, the Township retained Matrix Consulting Group (Matrix) to conduct an operational audit of its departments. Matrix issued a report (Matrix Report) presenting a comprehensive review of all township operations, management, and staffing.

The Matrix Report examined the current police staffing and identified efficiency opportunities related to the organization, staffing, and management of the police department. The Matrix Report concluded the current "4 & 4 shift," wherein patrol officers worked four days in a row followed by four days off, was the least efficient when compared to a "4 & 2 shift" (four days on and two days off), or a "5 & 2 shift" (five days on and two days off), because it required the greatest staffing complement for a twenty-four hour period. Matrix noted:

> Under the current schedule, 3 fewer officer positions are needed to maintain targeted service levels.
>
> The current shift schedule also creates the need for more officers than needed under an[ ] 8–hour or 12–hour shift. Analysis of an 8–hour shift schedule indicates that 19 fewer officers would be needed at recommended proactive time levels and to meet the current minimum staffing plan. Some of these [o]fficers could be used for additional street level proactive enforcement. However, 14 [o]fficer positions can be reduced.
>
> . . . .
>
> Under the 4–2 8–[h]our [s]hift schedule, the Township should reduce the number of [s]ergeant positions from 11 to 8 or continue with the current number of [s]ergeants and reduce the number of [l]ieutenant positions from 5 to 3.

On March 23, 2010, the Township Council adopted a resolution to implement each of the Matrix Report recommendations. The proposed scheduling alters existing patrol shifts from 4 & 4 shifts to 4 & 2 shifts, with the change to take effect on January 1, 2011.

In a letter dated June 17, 2010, the PBA and SOA expressed opposition to the shift scheduling modifications. Thereafter, the PBA and SOA filed independent PERC petitions, seeking to initiate compulsory arbitration with their mutually agreed arbitrator. No pre-hearing mediation dates were scheduled.

On August 9, 2010, the Township filed its own PERC petition, seeking a scope of negotiations determination regarding Article 6C of the PBA's CNA (docketed as SN–2011–011). On September 23, 2010, the Township filed a second petition regarding the comparable provision contained in the SOA's CNA (docketed as SN–2011–025). Both petitions sought PERC's determination as to whether "work schedules [we]re nonnegotiable in light of the express contract provision and governmental policy."

PERC issued its decisions and orders in the two matters, which were identical in all substantive respects. PERC noted the Township's reasons for the schedule modifications were based both on a managerial prerogative to fix the schedule and fiscal concerns. Nevertheless, PERC advised that "[i]n issuing scope of negotiations determinations, [it did] not consider the wisdom of the disputed contract language or proposals."

PERC found the 4 & 4 work schedule had been in effect since 2004 and was the result of negotiations settling the 2004–2007 contract. The work schedule in effect before this contractual change resembled the proposed schedule. Therefore, the current schedule was a negotiated change. In addition, PERC determined if the proposed scheduling changes were implemented, "the work year for these officers would be increased to 2080 hours per year" from approximately 1950 hours per year.

In its review, PERC could not conclude the current 4 & 4 work schedule or negotiations over a different work schedule would "significantly interfere with the Township's ability to meet its governmental policy need[s] to provide effective law enforcement services." Consequently, absent the Township's showing of such a compelling need, which is necessary to remove the work schedule from the arena of collective negotiations, work schedules were generally mandatorily negotiable. PERC concluded the "current work schedule and any proposal to change the current work schedule [was] mandatorily negotiable" and recommended the parties submit their arguments and evidence to interest arbitration. These appeals ensued.

■ When reviewing an agency's decision, well-established standards apply. First, we " 'will not upset a State agency's determination in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated a legislative policy expressed or implicit in the governing statute.' " *Commc'ns Workers of Am., Local 1034 v. N.J. State Policemen's Benev. Ass'n, Local 203*, 412 *N.J.Super.* 286, 291, 989 *A.*2d 1267 (App.Div.2010) (internal emphasis omitted) (quoting *In re Camden Cnty. Prosecutor*, 394 *N.J.Super.* 15, 22–23, 925 *A.*2d 63 (App.Div.2007)). Second, "we grant administrative agency action a 'strong presumption of reasonableness.' " *Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs*, 186 *N.J.* 5, 16, 890 *A.*2d 922 (2006) (quoting *City of Newark v. Natural Res. Council in Dep't of Envtl. Prot.*, 82 *N.J.* 530, 539, 414 *A.*2d 1304, *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980)).

■ "Our scope of review of PERC decisions reviewing arbitration is sensitive, circumspect and circumscribed." *Twp. of Teaneck v. Teaneck Firemen's Mut. Benev. Ass'n Local No. 42*, 353 *N.J.Super.* 289, 300, 802 *A.*2d 569 (App.Div.2002), *aff'd*, 177 *N.J.* 560, 832 *A.*2d 315 (2003). Generally, our role is restricted to:

"(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying the legislative policies to the facts, the agency erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors."

[*In re Jersey City v. Jersey City Police Officers Benev. Ass'n*, 154 *N.J.* 555, 567, 713 *A.*2d 472 (1998) (quoting *In re Musick*, 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996)).]

■ The Legislature has charged PERC with administering the Act and vested the agency "with 'the power and duty, upon the request of any public employer or majority representative, to make a determination as to whether a matter in dispute is within the scope of collective negotiations.' " *Id.* at 567–68 (quoting *N.J.S.A.* 34:13A–5.4(d)). Accordingly, substantial deference is given to PERC's interpretation of the Act. *In re N.J. Tpk. Auth. v.*

*Am. Fed'n of State, Cnty. & Mun. Emps., Council 73,* 150 *N.J.* 331, 352, 696 *A.*2d 585 (1997).

Although PERC's "interpretation of the statute it is charged with administering . . . is entitled to great weight, we will not yield to PERC if its interpretation is plainly unreasonable, contrary to the language of the Act, or subversive of the Legislature's intent." *In re Camden Cnty. Prosecutor, supra,* 394 *N.J.Super.* at 23, 925 *A.*2d 63 (alteration in original) (internal quotation marks and citations omitted). Deference is not afforded when PERC's interpretation gives a provision of the Act greater reach than the Legislature intended, *In re N.J. Tpk. Auth., supra,* 150 *N.J.* at 351–52, 696 *A.*2d 585, and no special deference is owed in an interpretation of a statute outside the agency's charge. *Teeters v. Div. of Youth & Family Servs.,* 387 *N.J.Super.* 423, 428, 904 *A.*2d 747 (App.Div.2006), *certif. denied,* 189 *N.J.* 426, 915 *A.*2d 1049 (2007). Finally, PERC is required to follow judicial precedents interpreting the Act. *In re Byram Bd. of Educ.,* 152 *N.J.Super.* 12, 22, 377 *A.*2d 745 (App.Div.1977).

On appeal, the Township challenges PERC's orders requiring mandatory negotiation of "[t]he current work schedule and any proposal to change the current work schedule[.]" The Township seeks reversal, claiming the determinations failed to consider the language of the freely negotiated CNAs, which include "clear, unambiguous and unequivocal" express waivers by the bargaining units of any rights to negotiate the work schedule. Further, the Township contends PERC failed to give due weight to the link between its managerial prerogative permitting determination of staffing levels and its obligation to control the public fisc. We disagree.

"Questions concerning whether subjects are mandatorily negotiable should be made on a case-by-case basis." *Troy, supra,* 168 *N.J.* at 383, 774 *A.*2d 476. *See also Bd. of Educ. of Englewood v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 7, 311 *A.*2d 729 (1973) (stating the lines between negotiable and non-negotiable subjects

are obscure and must be drawn on a case-by-case basis, pending further definitive legislation). Work schedules of public employees, specifically police officers, are identified as areas subject to negotiation. *See Rutgers Council of AAUP Chapters v. Rutgers,* 381 *N.J.Super.* 63, 74, 884 *A.*2d 821 (App.Div.2005) (holding "issues of compensation, which intimately and directly affect[ ] the work and welfare of the employee, are mandatorily negotiable" (internal quotation marks and citations omitted)). *See also N.J.S.A.* 34:13A–14d (requiring liberal construction of the Act's provision for compulsory arbitration); *N.J.S.A.* 34:13A–16g(8) (providing arbitrator may decide "continuity and stability of employment ... ordinarily ... considered in the determination of wages, hours, and conditions of employment through collective negotiations" with public police and fire department employees).

The Court has provided the following three-pronged test for determining the negotiability of an issue:

"[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy."

[*In re Jersey City, supra,* 154 *N.J.* at 568, 713 *A.*2d 472 (alteration in original) (quoting *In re Local 195, IFPTE,* 88 *N.J.* 393, 404, 443 *A.*2d 187 (1982)).]

Our facts satisfy the first two prongs of the *Local 195* test. The Township's proposed scheduling changes directly affect compensation paid to police officers, who would be working additional hours with less time between shifts and without commensurate compensation for additional hours. As the Court noted in *Local 195, supra,* 88 *N.J.* at 403, 443 *A.*2d 187, rates of pay and working hours are prime examples of negotiable subjects. Therefore, we conclude the modified schedule "intimately and directly" affects the work of the police force which, in turn, impacts public welfare. *Ibid.*

As to the second prong of the *Local 195* test, the disputes address issues not statutorily preempted from arbitration. *In re Mt. Laurel,* 215 *N.J.Super.* 108, 113–14, 521 *A.*2d 369 (App.Div.

1987). *See also Irvington Policemen's Benev. Ass'n, Local No. 29 v. Town of Irvington,* 170 *N.J.Super.* 539, 544, 407 *A.*2d 377 (App.Div.1979) (stating each scheduling case must be examined on its own facts with the issues subject to a case-by-case determination), *certif. denied,* 82 *N.J.* 296, 412 *A.*2d 801 (1980).

Consequently, in our view, the Township's arguments on appeal turn on whether the third criterion for determining mandatory negotiability was satisfied; that is, whether the requirement of arbitration on this scheduling change would significantly interfere with the determination of a governmental policy.

When reviewing that concern, we have stated

[t]he determination whether a negotiated agreement would significantly interfere with the determination of governmental policy, requires the striking of a balance between the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

[*In re Morris Cnty. Sheriff's Office v. Morris Cnty. Policemen's Benev. Ass'n, Local 298,* 418 *N.J.Super.* 64, 75–76, 12 *A.*3d 214 (App.Div.2011).]

Prior opinions have also examined related issues regarding the balance between the reasoned exercise of "government's managerial prerogative to determine policy" and issues that "intimately affect employees' working conditions" necessitating negotiation. *Ibid.* In *Local 195,* the Supreme Court reaffirmed a prior determination set forth in *Ridgefield Park Education Association v. Ridgefield Park Board of Education,* 78 *N.J.* 144, 156, 393 *A.*2d 278 (1978), that "the substantive decision to transfer or reassign an employee is preeminently a policy determination." *Local 195, supra,* 88 *N.J.* at 417, 443 *A.*2d 187. The Court also held that "decisions to reduce the work force for economy or efficiency are non-negotiable subjects." *Id.* at 408, 443 *A.*2d 187. So too, "[t]he decision to contract out work or to subcontract is similarly an area where managerial interests are dominant." *Ibid.* However, where an employer cut the work year from twelve to ten months "with the consequence of reducing annual compensation of retained personnel[,]" negotiation was deemed required. *In re Piscataway Bd. of Educ.,* 164 *N.J.Super.* 98, 101, 395 *A.*2d 880 (App.Div.1978).

We recognize the decision of whether a negotiated agreement significantly interferes with the determination of governmental policies requires the balance of the interests of the public employees and the public employer. " 'When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.' " *In re Jersey City, supra,* 154 *N.J.* at 568, 713 *A.*2d 472 (quoting *Local 195, supra,* 88 *N.J.* at 405, 443 *A.*2d 187).

Although we agree the CNA terms under review grant the Township the managerial latitude to schedule police shifts "as needed[,]" we reject the expansive reading of this phrase proffered by the Township to support the position the shift modifications merely "implement[ed] a provision of the contract which had been extensively bargained for by the parties." Applying basic rules of the contract construction, we consider the parties' agreements "as a whole" interpreting it "in a fair and common sense manner[,]" *Hardy ex rel. Dowdell v. Abdul–Matin,* 198 *N.J.* 95, 103, 965 *A.*2d 1165 (2009), and conclude the proposed changes extend beyond the non-negotiable role of personnel management and cross into the negotiable areas of rate of pay and total annual working hours. As presented, the modification mandates officers must work more hours without concomitant compensation, a change altering the core of the CNAs' provisions. Accordingly, the changes are not managerial, but ones requiring negotiation.

The Township suggests our opinion in *In re Morris County Sheriff's Office, supra,* supports its action as an exercise of its governmental policy role "to provide efficient and effective services within the police department in the face of burgeoning fiscal crises[,]" maintaining the essential role of government to "spend public funds wisely." We disagree. Our comments in *In re Morris County Sheriff's Office* were directed to curb the abusive practice of "featherbedding," where officers chose to work holiday shifts receiving overtime rates of pay, but performed no services. 418 *N.J.Super.* at 77–78, 12 *A.*3d 214. The Morris County policy

that ended this practice did not adversely affect any officers' contractual rate of pay or diminish annual weekly work-hours; the newly enacted policy merely eliminated an unnecessary abusive overtime practice. *Ibid.*

The proposal for shift modifications in this matter, however, is not targeted to curb abusive practices or the misuse of municipal resources. Rather, the proposed modifications strike at the heart of negotiated CNAs terms because they attempt to alter the level of compensation and work hours of police employees without negotiation.

As we stated in *In re Mt. Laurel, supra,* 215 *N.J.Super.* at 114, 521 *A.2d* 369, scheduling changes do not automatically require mandatory negotiation or exclusion as the determination rests on whether "a negotiated agreement will 'significantly interfere' with the managerial prerogative to determine government 'policy.' If so, then the government interest will be 'dominant' over that of the employees and the issue will not be negotiable." *Ibid.* Considering that principle in light of the facts presented in this matter, we conclude the requirement of negotiation of scheduling, including corresponding salary adjustments, "would not significantly interfere with the determination of governmental policy" to supply police services. *In re Jersey City, supra,* 154 *N.J.* at 568, 713 *A.2d* 472 (internal quotation marks and citation omitted).

We also find unavailing the Township's characterization of the schedule modification as a managerial decision, bottomed on a need to achieve efficiency and conserve municipal resources. The implementation of prudent restrictions on municipal spending is applauded and we are very aware that every level of government is pressed by the crunch of a tightened economy. Although, the Township maintains the managerial prerogative to "spend public funds wisely[,]" *Caldwell–West Caldwell Educ. Ass'n v. Caldwell–West Caldwell Bd. of Educ.,* 180 *N.J.Super.* 440, 452, 435 *A.2d* 562 (App.Div.1981), a desire to achieve thrift cannot sustain the adoption of a policy abrogating the Township's binding contractual

obligations to its law enforcement employees. The Township's proposed shift modifications do not merely adjust work assignments or include lay-offs. Rather, the proposal cuts in half the number of the contractually negotiated days between regular four-day work shifts, resulting in each officer working more hours per year for the same pay.

We also do not agree that the language of Articles 6C and 7C of the SOA and PBA CNAs waive the Township's negotiation obligation. To be given effect, the enforceability of a contractual waiver of statutory rights requires the waiver to "be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively." *Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*, 78 *N.J.* 122, 140, 393 *A.*2d 267 (1978). In this matter, negotiations over similar scheduling issues have occurred since 1991, notwithstanding the Township's reservation of the "right to change shifts" as contained in the prior CNAs. This pattern of past practice between the parties reflects an intention that the type of shift change now proposed must be negotiated. *See Rutgers Council of AAUP Chapters, supra,* 381 *N.J.Super.* at 74, 884 *A.*2d 821 (holding "[s]uch issues of compensation, which 'intimately and directly affect[ ] the work and welfare' of the employee, are mandatorily negotiable" (quoting *In re Jersey City, supra,* 154 *N.J.* at 568, 713 *A.*2d 472)).

Following our review of the facts, we conclude the implementation of shift changes that directly alter annual work hours and rate of compensation requires negotiation. Therefore, PERC's determinations on these issues were neither arbitrary nor capricious.

Affirmed.